IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARCOS LUCERO,

       Petitioner,

v.                                 CIV 02-799 MCA/KBM

TIM LeMASTER, Warden, et al.,

       Respondents.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION

     A jury convicted Petitioner Marcos Lucero of first degree murder, aggravated battery, and tampering with evidence.  He was eighteen at the time the crime was committed and is serving a total sentence of life imprisonment plus five and one-half years.  *Doc. 14,* Exh. A.

     This matter is now before the Court on Lucero's petition and amended petition for a writ of habeas corpus under 28 U.S.C. § 2254, Respondents' Answer and Motion to Dismiss, the record proper, and Petitioner's responses.  *See Docs. 1, 10, 14-18, 23-24.*  Because he filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), its standards apply to this case.  *E.g., Upchurch v. Bruce,* 333 F.3d.1158, 1162-63 (10th Cir. 2003); *Paxton v. Ward,* 199 F.3d 1197, 1204 (10th Cir. 1999).  That is, a federal court cannot grant a writ of habeas corpus unless:  (1) the state court decision is "contrary to, or involved an unreasonable application of . . . Supreme Court" precedent; or (2) is "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. §§ 2254(d)(1)-(2); *see also Bell v. Cone,* 535 U.S. 685, ___, 122 S. Ct. 1843, 1850 (2002); *Williams v. Taylor,* 529

U.S. 362, 405-06, 411-13 (2000); *Torres v. Mullin,* 317 F.3d 1145, 1150-51 (10th Cir. 2003).[1]  In

this matter, all of the issues can be resolved on the record.  Therefore, an evidentiary hearing is

unnecessary.  *E.g., Trice v. Ward,* 196 F.3d 1151, 1159 (10th Cir. 1999), *cert. denied,* 531 U.S.

835 (2000); Rule 8(a), *Rules Governing Habeas Corpus Under Section 2254.*

     In a prior order, I noted that Paragraph 1 of Respondents' Answer "'assumes that the

amended petition supersedes the original petition.'"  *Doc. 19* at 1 (quoting brief).  I further noted,

however, that *pro se* pleadings are construed liberally, and so I considered the amended petition

as a supplement, as opposed to a superseding pleading.  *Id.*  Petitioner's various pleadings raise

new claims or reiterate or embellish his other ones, and he acknowledges that some of his

additional claims are unexhausted.  *Doc. 23* at 1; *see also generally Docs. 17, 18, 23, 24.*

     By my liberal construction and count, the habeas claims Petitioner raises fall into five

broad and sometimes overlapping categories:  (1) erroneous rulings by the trial court;

(2) prosecutorial misconduct; (3) ineffective assistance of trial and appellate counsel, including the

cumulative effect of counsel's alleged errors; (4) inconsistent verdicts; and (5) fundamental error

based on allegations of factual innocence.  He also raises an access to the court claim.

---

    [1]  A state decision is "contrary to" Supreme Court precedent if it "arrives at a conclusion opposite
to that reached by [the Court] on a question of law or if the state court decides a case differently than [the
Court] has on a set of materially indistinguishable facts."  *Williams,* 529 U.S. at 413.
    A state decision is an "unreasonable application" of Supreme Court precedent if it "identifies the
correct governing legal principle from [the court's] decisions but unreasonably applies that principle to the
facts of the prisoner's case."  *Id.*  Put another way "a federal court may grant relief when a state court has
misapplied a 'governing legal principle' to 'a set for facts different from those of the case in which the
principle was announced.'"  *Wiggins v. Smith,* ___ U.S. ___, ___, 123 S. Ct. 2527, 2535 (2003) (quoting
*Lockyer v. Andrade,* 538 U.S. ___, ___, 123 S. Ct. 1166, 1175 (2003)).  The application "must have been
more than incorrect or erroneous . . . [it] must have been objectively unreasonable.  *Id.* (further citations
and quotation omitted).
    A state decision rests on an "unreasonable determination of the facts" where it is shown by "clear
and convincing evidence," 28 U.S.C. § 2254(e)(1), that the factual finding is erroneous.  *Id.* at 2539.

I have carefully considered the entire voluminous record as well as the submissions of the parties.  Due to the sheer volume of materials, I refer to pleadings in the instant case by their document number.  Transcripts from the trial and state habeas proceedings are introduced as such and distinguished by volume number and/or date.  Citations to the "Record Proper" refer to the two-volume record transmitted to the New Mexico Supreme Court on appeal.

Based on my review, I find the access to the courts claim noncognizable as well as meritless, and both the exhausted and unexhausted issues without merit.  Accordingly, I recommend that this action be dismissed with prejudice.

# I.  Factual Background

## A.  The Juveniles Involved In The Two Altercations

On November 2, 1995, two altercations took place within a short period of time and within a several block area of an Albuquerque neighborhood.  All of the juveniles involved were acquainted with each other and fall into two groups.  None of the juveniles are related, despite identical surnames.

Petitioner, eighteen-year-old Marcos Lucero (aka "Goofy"), and his friends eighteen-year-old Carlos Garcia (aka "Carlos Michelback" and aka "Tiny") and thirteen-year-old Lorenzo Lucero (aka "Guero" and aka "Wetto") comprise the first set of juveniles.  *See Doc. 23,* Exh. 6 (hereinafter "*Marcos Interview*"); *id.,* Exh. 4 (Carlos' interview); *id.,* Exh.7 (Lorenzo's interview).  Carlos and Lorenzo are about the same height, and Marcos is taller than both of them. *Trial Transcript Vol. XII* at 232.  Lorenzo was wearing a green shirt that day.  *Id.* at 233.

Fifteen-year-old Eric Devine, his fifteen-year-old friend Clifton Montoya, and Clifton's girlfriend, fifteen-year-old Lynnae Lucero, comprise the second set.  *See Doc. 23,* Exh. 2

3

(hereinafter "*Eric Interview*"), *id.* Exh. 1 (police report noting Clifton's age).  Eric's

grandmother, with whom he resided, lived across the street from Carlos' home.  Desi Gurule is a

juvenile whom the police questioned after the shootings, but who in fact was not a participant in

either situation.  *See Trial Transcript Vol. XIII* at 170.

Eric testified for the State under a grant of immunity for delinquency charges stemming

from the first of the two altercations.  Eric had also been indicted for the second altercation, but

those charges were withdrawn, presumably before he testified.  *See id.* at 79, 127; *Trial

Transcript Vol XIV* at 26.[2]

## B.  The State's Evidence

### (1)  Marcos Was The Shooter Per His Admission

There was no dispute who shot the gun that wounded Clifton and killed Lynnae.  Carlos

told the police that Marcos did so and, indeed, Marcos admitted to firing the weapon upon his

arrest said something to the effect:  "You got your man.  I was going to turn myself in."  *Trial

Transcript Vol. XIII* at 177; *see also id.* at 164; *Marcos Interview* at 1-2 (Miranda and waiver

thereof).  Detective A.V. Romero interviewed Marcos after arrest and taped his statement.

Marcos explained his version of the circumstances that culminated in the fatal shooting, and told

the police that he had thrown his gun in an irrigation ditch.  Although that same night he tried to

assist the police in locating the gun, it was never recovered.  The tape of Marcos's statement was

---

[2] *See Record Proper* at 75-76 (April 3, 1996, Children's Court petition charging Eric with two counts of aggravated assault with a deadly weapon against Marcos; one count of aggravated assault with a deadly weapon against Carlos; shooting from a motor vehicle with no resulting injury, tampering with evidence and unlawful possession of a firearm by a minor); *id.* at 77-79 (defense motion to admit Eric's statements to police as it appeared State would not grant Eric immunity); *id.* at 99-102 (State's subsequent motion to compel Eric's testimony under grant of immunity).

played for the jury.  *See Trial Transcript Vol. XIII* at 167-69; 178-79.  He did not testify at trial.

## (2)  Initial Encounter Between Eric and Marcos

There is also no dispute that prior to the fatal shoot-out, Eric and Marcos had an encounter.  They had diametrically opposing stories, however, about which one was the victim of the other's aggression.  Marcos claimed that while he was walking toward Carlos' house around 3:00 p.m., Eric drove by and made gang hand signs.  When Marcos responded in kind, Eric turned the car around and shot at Marcos with a handgun.  *Marcos Interview* at 3, 6-8.  Eric did own a .22 caliber gun and later the police did find three "very damaged" .22 caliber shell casings fired from Eric's gun lying in the street in that area.  *Trial Transcript Vol. XII* at 65, 85.

Eric did not deny encountering Marcos on the street that day.[3]  But, he told the police that Marcos threw rocks at his car, uttering the name of a local gang.  *Eric Interview* at 13.  At trial Eric explained that he did not shoot at Marcos.  He testified that he had been home from school sick that day and did not get up until late in the afternoon.  Clifton called, and Eric agreed to pick him up after taking a shower.  *Trial Transcript Vol. XIII* at 46-48.  Eric's mother arrived at his grandmother's house, and Eric asked if he could use her car to pick up Clifton.  *Id.* at 50.

On the way to pick up Clifton and driving without his contacts, Eric missed his turn thinking he saw someone walking along the street whom he knew.  Eric squinted and stared and slowed down to determine if it was his acquaintance and, if so, to give him a ride.  Marcos then started throwing signs and said, "Los Duranes."  Eric drove by, gave Marcos the finger, and then

---

[3]  Their assertions about what time this occurred do vary somewhat.  According to Marcos' statement, he would have been in the area between 3:10 and 3:15 p.m.  *See Marcos Statement* at 3. According to Eric, the encounter would have taken place somewhere between 3:30 and 4:00 p.m.  *See Trial Transcript Vol. XII* at 153, 155, 157-58; *Trial Transcript Vol. XIII* at 50, 59-60.

5

turned the car around to go back toward the turn he missed.  At that point, Marcos threw a rock, hitting the car Eric was driving.  *See id.* at 51-57.  Eric testified that reason shell casings from his gun were in that area because he had shot his gun in the air at that location on another occasion. *Id.* at 78-79, 101.

**(3)  Marcos' Response To Initial Encounter Was To Arm Himself**

There is some discrepancy whether what happened next involved Marcos alone or Marcos accompanied by Carlos and Lorenzo.  According to the State's evidence, however, there is no dispute that right after the initial encounter between Eric and Marcos, Marcos decided to arm himself.  According to Marcos's statement to the police, immediately after his encounter with Eric, he stopped at the gas station near Carlos' home to call a friend and have this friend bring him a gun.  After making the call, he went to Carlos' home, explained to Carlos and Lorenzo what had happened, returned to the gas station to fetch the gun and then went back to join Carlos and Lorenzo at Carlos' home.  *See Marcos Interview* at 4, 10-12.

Because Carlos was deceased at the time of trial, Lorenzo was the only one of the Marcos group who testified.[4]  According to Lorenzo's testimony, he had stayed home from school that day and joined Carlos at a McDonald's restaurant around lunchtime.  *Trial Transcript Vol. XII* at 213.  Later, Marcos came into Carlos' house in an agitated state, saying Eric shot at him.  *Id.* at 213-14.  Within fifteen minutes, they all went to the gas station to carry out Marcos' plan to get a gun.  Lorenzo did not hear anyone tell Carlos's mother where they were going. They arrived at the gas station within five minutes, and Marcos made a telephone call.  Within

---

[4]  Carlos died on January 26, 1996, several months before Marcos' trial.  *See Record Proper Vol. I* at 32 (State notice to offer possible hearsay statements by Carlos); see also *Doc. 23,* Exh. 23 (duplicate of State notice); *id.,* Exh. 17 (police report on subsequent incident, noting Carlos had died).

twenty-five minutes, someone delivered a gun to Marcos.  They headed back toward Carlos'

house.  *See id.* at 215-18, 222; *Trial Transcript Vol. XIII* at 27.[5]  On direct examination, the

prosecution elicited from Lorenzo that he was wearing a green shirt on the day in question, but

also elicited the response that Marcos was the only one from the Marcos bunch who discharged a

gun that day.  *Trial Transcript Vol. XII* at 233.

### (4)  The Marcos Bunch Follows The Eric Bunch

Because Marcos was so angry that his hands were shaking and he could not load the .9

millimeter bullets into his gun, Lorenzo had to do so for him.  *See Marcos Interview* at 4, 11-12;

*Trial Transcript Vol. XII* at 229; *Trial Transcript Vol. XIII* at 40.  Marcos said:  "Let's go scare

them."  *Trial Transcript Vol. XII* at 230.  It took four minutes to walk from the gas station to

Carlos's house.  *Trial Transcript Vol. XIII* at 13. On the way back, they saw Eric's car parked in

the driveway, and Marcos remarked it was the car from the earlier incident.  *Id.* at 33.

Meanwhile, Eric spotted Clifton and Lynnae, who happened to be with Clifton and who

was on he way home.  Eric picked up Clifton and Lynnae and took them back to his

grandmother's house to give the car back to his mother.  They only stayed inside for a short time,

---

[5]  Carlos' mother, who by her own admission was absentminded due to heavy medications, generally corroborated the notion that Marcos came by in a panic saying Eric had shot at him.  She also testified that on the day in question, Marcos had a shaved head.  *See Trial Transcript Vol. XII* at 92-94. Her estimate of the time of day this took place and the length of time the boys were in her home exceeds the time frame for the shooting if Lorenzo's testimony about accompanying Marcos to the gas station is credited.  She believed Marcos arrived at her house sometime between 3:30 or 4:00 and thought the boys stayed in Carlos's room for fifteen to twenty minutes before telling her they were going out to go to McDonald's.  The officers received the call about the shooting at approximately 4:09 p.m.  *See id.* at 41. She also stated that, upon entering her home, Marcos mentioned Eric and two other unnamed males had shot at him.  *See id.* at 95-96.  Lorenzo testified that Marcos only mentioned Eric and not any others, however, he did not see Marcos when he first arrived, since he and Carlos were in Carlos's room.  *See id.* at 213-14.

during which time Eric took the opportunity to fetch his new gun, acquired two weeks before,
and to load it.  Clifton denied that either he or Lynnae handled Eric's gun.  Eric's testimony
indicated that only he had touched his gun.  They then left on foot to walk Lynnae home.  *See
Trial Transcript Vol. XII* at 153, 155, 157-58 178; *Trial Transcript Vol. XIII* at 59-62.

        The Marcos bunch was waiting outside of Carlos' home.  Upon seeing the Eric bunch
leave on foot, the Marcos bunch decided to follow them.  *See Marcos Interview* at 12; *Trial
Transcript Vol. XII* at 220.  According to Lorenzo, Marcos was acting "hyper," *Trial Transcript
Vol. XII* at 222, and Lorenzo was scared that "people were going to end up dying or something,"
*id.* at 224.  He and Carlos went with Marcos anyway, to "back him up."  *Trial Transcript Vol.
XIII* at 19.

        According to Eric, the Marcos bunch had hopped the fence in Carlos's yard and began to
follow them, saying "what's up now and all kinds of stuff."  Eric mistakenly believed that Desi
was among the Marcos bunch.  *See id.* at 65-67, 170.  Although Eric, Clifton and Lynnae had
noticed Marcos' gun and/or heard a bullet being chambered, they too continued on, putting a
frightened Lynnae ahead of them and continually looking back at the Marcos bunch.  *See Trial
Transcript Vol. XII* at 166-68; *Trial Transcript Vol. XIII* at 68-70, 74, 75, 120.

                        **(5)  Marcos Fires The First Shot**

        When the Marcos bunch was positioned on one side of the vacant lot and the Eric bunch
on the other, the shooting began.  Eric was looking at Marcos at that point, but was not
approaching them or brandishing his weapon.  *See Trial Transcript Vol. XIII* at 21-23.  There was
no dispute that Marcos fired the first shot.  Marcos was "tired of Eric," *Marcos Interview* at 14,
he was "pissed" and "want to shoot" Eric, *id.* at 15, and "[i]n a way" wanted to kill him, *id.* at 24,

for the prior incident that day as well as things Eric allegedly had done to Marcos and his family and friends in the past, *id.* at 14, 19-20, but according to Marcos he instead shot once in the air, *id.,* for the purpose of sending Eric the message that "Oh, I don't know.  I guess – well, I can get guns, too," *id.* at 23.

According to Marcos and Lorenzo, after Marcos fired the first shot, Eric stood looking at them for about five seconds and then took out his pistol and began firing toward them.  *See id.* at 17-18; *Trial Transcript Vol. XII* at 225.  Eric fired approximately three shots and then Marcos fired back, up to ten shots.  *See Trial Transcript Vol. XII* at 230 226-27; *see also Trial Transcript Vol. XIII* at 24-25.  Indeed, the police subsequently recovered from the vacant lot three .22 caliber cartridge casings fired from Eric's gun, and eleven .9 millimeter cartridge casings all from the same unidentified gun that could not have been Eric's.  *See Trial Transcript Vol. XII* at 48-49, 54, 83, 86-87.

According to Eric and Clifton, Marcos did not fire a warning shot.  Instead, Marcos simply opened continual fire on them, striking Clifton and Lynnae from behind as they were running away.  Clifton did not actually hear any of the shots, was not sure whether Eric fired back and could not see who was shooting from the Marcos side.  Eric believed he started returning fire after Marcos had shot about four of five times, and Eric also could not see that far without his contacts.  *Id.* at 170-72, 175, 179, 204-206; *Trial Transcript Vol. XIII* at 69-71,75, 81, 119; *see also id.* at 135-45 (testimony of Eric's optometrist re: difficulty seeing at a distance and squinting to compensate).  Eric touched Lynnae and Clifton on the hands while trying to tend to them after being shot.  *Trial Transcript Vol. XII* at 173-74.

Neighbors who heard the shots did not hear any pause in firing.  *See id.* at 110-111, 122,

125, 35-37, 146-47.  One neighbor, Alan Sandoval, saw the shooting from a distance of "a football field or a football field and a half away."  *Id.* at 123.  Consistent with what he told the police on the day of the shooting,[6] he first testified that he saw "all three males [of the Marcos bunch] firing."  *Id.*  He could not see the boys' faces and only recalled "either a short haircut or a shaved head and a green jersey."  *Id.*  Another neighbor, Paul Valencia was talking to Sandoval when the shooting began.  *See id.* at 122, 132-33.  Valencia "saw three youths [in the Marcos bunch].  The tallest youth wearing a green jersey was the one doing the shooting" and the "other two youths" were "just looking on."  *Id.* at 133-34.  Valencia likewise heard consistent shooting, recollecting the sequence as approximately three shots from the first shooter, then a couple from the other side, and then the initial shooter emptying his gun.  *Id.* at 135-37, 146-47.

### (6)  Marcos Shot Clifton And Lynnae

Immediately after the shooting, the police questioned Eric, who denied he had a weapon and furthermore identified Carlos as the shooter.  He did so not because he actually saw who was shooting, but because of a longstanding animosity between them.  *See Trial Transcript Vol. XIII* at 67, 70, 77, 80-81, 125; *see also Eric Interview* at 3-4.  Because Eric had also mentioned Desi, the officers thus took Carlos and Desi in for questioning.

Carlos identified Marcos as the shooter and Lorenzo as being there with them.  *See Doc. 23,* Exh. 4 at 5, 10, 13, 15, 33.  He provided the police with a telephone number for Marcos and offered to call him for the police.  *Id.* at 37-38.  They taped the subsequent conversations between

---

[6]  *See Doc. 23,* Exh. 3 ("Sandoval then observed all three subjects holding pistols and start shooting in a northerly direction, toward Edna NW.  All three subjects fired several times. . . .  Sandoval did not know who the three subjects are, but described them as young teenager Spanish males.  One of the subjects was wearing a dark green tank top basketball jersey.  Sandoval was unable to describe any other clothing or a physical description.").

Carlos and Marcos and Lorenzo in which all three implicate Marcos as the shooter.  The police

traced the number where Marcos was reached and patrol officers went to pick him up.  *See Doc.*

*23,* Exh. 5; *Trial Transcript Vol. XII* at 237-41; *see also Trial Transcript Vol. XIII* at 152-57.

The jurors heard the tapes during Marcos's trial.  *Trial Transcript Vol. XIII* at 162-163.

Lorenzo was surprised the police had Carlos and Desi in custody, because those two had

not done anything.  *Trial Transcript Vol. XII* at 339.  Although Lorenzo did not unequivocally tell

Detective Romero that Marcos shot Clifton and Lynnae when first questioned, he did identify

Marcos as such at trial.  *See Trial Transcript Vol. XII* at 244; *Trial Transcript Vol. XIII* at 30, 38,

41-42.  Forensics testimony established that a .9 millimeter bullet killed Lynnae.  *Trial Transcript*

*XII* at 85.  Clifton testified about his gunshot wound.  *Id.* at 172.

### C.  Defense Strategy

Marcos was represented by two public defenders.  Ben Gonzales, who had handled

approximately three dozen murder cases by that time, sat as first chair.  At second chair sat  Eric

Hannum, with  3½ years as a public defender on this his first murder case.  *See State Habeas*

*Evid. Hrg 10/1/01* at 36-37, 42.

When counsel first met their client, Marcos maintained that he was not the shooter.  He

asserted that he was high on acid at the time of the shooting and when he gave his statement to

the police.  Nevertheless, Marcos asserted that everything he had told the police was correct save

for one detail – that Lorenzo was the shooter.  *See id.* at 5-9, 34-35, 43.  Thereafter, Marcos

consistently asserted that Lorenzo was the shooter and consistently expressed to his attorney that

he wanted to testify at his trial, although ultimately he did not.  *Id.* at 7, 22, 43.

After reviewing the State's evidence above, counsel believed (1) "it didn't seem that we

11

had a good chance of suppressing" the statement Marcos made to the police, *id.* at 9, and (2)
"when we listened to the tape of his statement, there's nothing in there that would lead you to
think that he was not in his right mind," *id.*  Since Marcos characterized his first shot as a
"warning" shot and not deadly force, *see id.* at 16-17, counsel decided it was better to employ a
self-defense and defense of others strategy, rather than to assert a defense consistent with Marcos'
proclaimed innocence.  *See id.* at 6, 8, 9, 22, 47-48.  After researching the law, they believed that
based either on the wording of uniform instructions or the "use note" to the instructions that they
would be entitled to a self-defense instruction as an exception to the initial aggressor exception to
self-defense.  *See id.* at 16-17, 33, 39, 52. 54-55.  "It seemed – we had two choices.  We had –
we could either go with a self-defense claim, which we thought this a good basis in law and fact
or to go with this attempt to recant a fairly detailed confession.  And given those two options we
though it was by far the better option to go with the self-defense claim."  *Id.* at 32; *see also id.* at
46.

They discussed the risks of pursuing that course, along with the possibility of a plea,[7] with
Marcos.  *Id.* at 18, 44-45.  They explained that it did not matter whether counsel believed him:

> what matters is how does all this sound to a jury.  What's the jury
> going to believe here.  Is this reasonable for the jury to believe. . . .
> We are stuck with the facts as we are handed them with the
> testimony as we anticipate it's going to come.  And we can't
> change certain historical facts.  So we have to incorporate those
> facts such as they are to our theory of the defense.  In this case we
> thought we had a viable theory, a self-defense claim.

*Id.* at 20-21.

---

[7] Plea negotiations were ongoing.  *See Record Proper* at 27, 34; *Trial Transcript Vol. III* at 24;
*Trial Transcript Vol. IV* at 10.

> We thought that – we had two choices here.  One, accept that his
> statement was going to come into evidence.  And we thought it to
> be clear that he would be entitled to a self-defense instruction based
> on that statement or go with his testimony which is, yes, I
> confessed, but I didn't really mean it.  I confessed just to protect
> Lorenzo.  We thought that a jury would have a hard time buying
> that.

*Id.* at 9-10; *see also id.* at 50-51, 59.

Counsel did not "affirmatively prevent Marcos from testifying [but they] leaned on him

pretty hard."  *Id.* at 22.[8]  They successfully persuaded him to not take the stand and proclaim his

innocence while they were pursuing a self-defense theory.  *Id.* at 22-23; *see also State Habeas*

*Evid. Hrg. 10/2/01* at 7 ("They kept convincing me that it would hurt the case more than I would

help the case if I took the stand and testified and told the truth.  That I wouldn't have a very good

---

[8]    They "leaned on him hard" by saying "he'd be a fool to testify.  That was just not a
viable defense.  And if he wanted any kind of chance at a fair trial or chance of acquittal the only
way was to pursue the self-defense claim."  *State Habeas Evid. Hrg 10/1/01* at 23.

> You could characterize it as brow beating – I mean I – it's my – I
> don't remember specifically, but it's my practice in these kinds of
> confrontational discussions with clients, yeah, it's like if you want
> to be an idiot, sure, go ahead.  You have a right.  It's your right.
> It's your life.  But – so, yeah, I would phrase it like that. . . .

> I would tell him also I can't stop you from testifying.  We can't
> stop you from testifying.  If you want to go up there and tell that
> story that nobody is going to believe and go to prison for the rest of
> your life that's your right.  We can't stop you.  But we need to
> know now.  We need to know before opening statements.  Because
> once we made an opening statement we were – we were at that
> point sort of tipping our hand and setting out what we felt was a
> self-defense claim.  So in answer to an earlier question when was it
> clear that Marcos would not testify, it was sometime before
> opening statement.

*Id.* at 27.

chance of possibly getting acquitted or beating the case whatsoever in any way, shape or form."). At least one attorney thought that Marcos' young age was an advantage in persuading him not to testify.  *State Habeas Evid. Hrg. 10/1/01* at 38-39.

In their opening, defense counsel focused primarily on three things.  First, that Eric and two others first shot at Marcos while he was walking down the road.  *Trial Transcript Vol. XI* at 183.  Second, that Marcos fired an unequivocal warning shot and after a substantial pause, Eric opened fire on them at the vacant lot.  *Id.* at 185, 187.  Third, the only juveniles who tested positive for primer residue were the victims Lynnae and Clifton.  *Id.* at 189.

At the end of the prosecution's case, defense counsel moved to dismiss the murder charges, arguing either that the State was estopped from claiming Marcos was the initial aggressor based on the charges it had filed against Eric, or that the facts in evidence at trial showed Marcos fired a nondeadly warning shot thereby establishing he was not the initial aggressor.  As such, if Eric was the initial aggressor then Marcos had the right to self-defense and the homicide and battery charges should be dismissed as a matter of law.  *See Trial Transcript Vol. XIV* at 20-24.[9]  The trial judge denied the motion.  *See id.* at 30-31.

Counsel tendered their proposed instructions, including the defense proposal for self-defense instruction, and the case proceeded.  *Id.* at 33.  Defense counsel called as their expert witness the forensic scientist with the Albuquerque Police Department who conducted the tests on all of the juveniles.  *Trial Transcript Vol. XIV* at 35, 37-38; *see also Trial Transcript Vol. XIII* at 173 (all suspects that night who were tested for primer residue were:  Marcos, Eric, Carlos,

---

[9]   Defense counsel also argued that if a conspiracy charge could be pursued, it could only be pursued as a single conspiracy, and the prosecutors agreed.  *Trial Transcript Vol. XIV* at 24-25, 27.

Desie, Lynnae, and Clifton).  The expert testified that a person acquires primer residue by firing a weapon, touching a recently fired weapon, touching a lead bullet, or touching someone who or something that has the residue on them.  *Trial Transcript Vol. XIV* at 40, 45-46.  The results of his testing were:

| | | |
|---|---|---|
| Marcos | – | inconclusive for both hands, *id.* at 38; |
| Eric | – | inconclusive or negative, *id.* at 39; |
| Carlos | – | inconclusive or negative, *id.;* |
| Desie | – | inconclusive and negative, *id.;* |
| Lynnae | – | positive on both palms; inconclusive on rest of hand; *id.* at 40; and |
| Clifton | – | positive on right hand; inconclusive on left, *id.* at 40-41. |

On cross-examination, the expert testified that although the primer tests show the presence of certain chemicals, the tests do not give the expert a basis to conclude who actually fired the weapon.  *Id.* at 49.

The trial judge subsequently denied any instructions on self-defense or defense of others after extensive oral argument and discussion[10] and taking the matter under submission saying:

---

[10]  For example, the trial judge stated at one point:

I will tell you, this bothers me a lot both ways.  From your [defense] perspective, as far as I can tell, what you have got is a situation where [Eric] after gang signs are thrown at each other, shoots at [Marcos].  [Marcos] goes and arms himself and fires his gun in the air, a larger and more powerful weapon in the air, and according to his statement he does this in order to scare [Eric.]  He knows at this time that whatever period of time it was, half an hour, 25 minutes to an hour earlier, [Eric] was armed.

Now, the problem I have with the self-defense instruction is saying that if I fire a gun in the air, getting your attention and to scare you, that's not some form of aggravated assault, and saying that this is not use of force which creates a substantial risk of death or great bodily harm, and I am firing the gun off to scare you.  That bothers me a lot.  I am trying to figure out a scenario where that's not the use of force which would create the risk of substantial bodily harm and where I can find that reasonable minds can differ as to what was being done here.  If this is not provocative in the context of it, if it's not cold, calculated – that's – I'm

15

Well, I have gone over this and over it, and I read and reread the cases. This is the way it will be: On the issue of self-defense, I just don't see it. There will be not be an instruction on self-defense, period. I have looked at it. I consider it in the light most favorable to the defendant. The light most favorable to the defendant, in the initial contact, the initial incident, if the defendant had a firearm and fired back under those circumstances, maybe. Probably. I don't see any problem with the self-defense instruction under the circumstances. But leaving that encounter, arming himself, lying in wait, following and acting in the provocative fashion, I don't see any basis for self-defense under the circumstances. I just don't. So there will be not be an instruction on self-defense.

On the issue of voluntary manslaughter, I think there's a strong argument for significant cooling off period. I think there's a strong argument for this not being something a reasonable person would do, but I will – I think reasonable minds – there is some room for difference on that, and that may be allowed as a stepdown from second degree on that.

*Id.* at 104-05; *see also id.* at 57-96 (argument and discussion); *Record Proper* at 162-66 (rejected instructions).

Defense closing focused on the fact that the State conceded Eric shot at Marcos in the initial encounter, and submitted that the subsequent events constituted only voluntary manslaughter on the part of Marcos because of Eric's provocation during both incidents. See *Trial Transcript Vol. XV* at 36-37, 42-43, 48-50.

### D.  Marcos' Version Had He Testified

At a state habeas evidentiary hearing in 2001, Marcos testified to what he would have said

---

trying to play devil's advocate for both of you and stretch your arguments and then I can make my best decision in it, but that's the problem I have with your side of the thing.

*Trial Transcript Vol. XIV* at 83-84.

had he elected to testify at trial.  He explained that he was able to recall all of the details of the

six-year-old incidents, even minute ones, because he has a very good memory and because he had

been studying his case.  *See State Habeas Evid. Hrg. 10/2/01* at 40, 32, 50 (recalling a clock said

10:23 p.m. and the distance across the vacant lot was 206 feet and 7 inches).  He also indicated

that although he had taken acid just before going to Carlos' house and had smoked marijuana at

different points throughout the incidents and the evening.  Marcos stated that the drugs had no

adverse effect on him because he "had a tolerance for them."  *Id.* at 28; *see also id.* at 9, 11, 26.

He experienced a "bad trip" after the fatal shooting when he went back to fetch and hide the gun

and realized Clifton and Lynnae were shot and when his grandmother yelled at him for having

been in the area.  *Id.* at 22, 25.  Otherwise, the drugs were "just making [him] in a good mood."

*Id.* at 28. The testimony he would have given is as follows.

  Just prior to the two altercations, Marcos had been in a "hospital" for nine months for

"reintegration treatment" after being held on juvenile charges.  *See id.* at 15, 37.  On his way to

Carlos' house, Eric pulled up and asked Marcos where he was from; when Marcos said

"Duranes," Eric began shooting from a distance of seven feet.  *Id.* at 10.  Marcos ran and Eric

chased him in the car.  *Id.* At 10.  When Marcos reached Carlos' house, they went outside to

smoke a joint to calm Marcos down.  At that point Eric pulled up in his grandmother's driveway

with Clifton and Lynnae.  Eric exited the car and smiled at Marcos as he entered his

grandmother's home.  *Id.* at 11-12.

  Carlos and Lorenzo were armed with .9 millimeter guns.  *See id.* at 13, 16, 18.  When Eric

left his grandmother's house, he flashed his gun.  *Id.* at 15.  In response, Lorenzo and Carlos

pulled out their guns and cocked them, but Eric, Lynnae and Clifton continued walking.  *Id.* at 16.

Lorenzo and Carlos said to Marcos, "let's follow and scare them." *Id.*

Marcos contends that he did not want to go. He was afraid someone would get hurt and that he would wind up back in the "hospital." *Id.* Nevertheless, he went anyway to "protect" his friends. *Id.* at 16-17. Marcos asserts that, at the vacant lot, it was Lorenzo who shot into the air and that Eric responded by returning fire. *Id.* at 18. Marcos tried to stop Lorenzo from shooting back in response to Eric's shots because Marcos saw "an old couple" sitting on the porch where Eric was located. *Id.* at 19. Marcos therefore tried to lower Lorenzo's arms, but Lorenzo succeeded in emptying the clip. *Id.* at 19, 50. Marcos and his bunch ran. *Id.* at 19.

They caught up with each other shortly thereafter at Carlos' house. *Id.* at 20. Lorenzo had left his gun at the scene. He and Carlos begged Marcos to go back and fetch it because Marcos could run the fastest. *Id.* at 20-21. Marcos agreed, and in retrieving the gun observed Clifton and Eric upset with Lynnae lying on the ground. Marcos took the gun and hid it in a trash pile and then proceeded to Carlos' house. *Id.* at 21-22. "Carlos' mom" heard someone screaming about a killing. *Id.* at 22. They believed it was Eric or his mother standing outside Carlos' home yelling "you killed her." *Id.* at 44. Carlos's mother instructed her other son to take the three kids in the car and away from the scene. *Id.* at 22.

Marcos, Lorenzo and Carlos then traveled to Lorenzo's house, where they "all [got] down." *Id.* at 23. After Carlos left, Lorenzo cried and threatened to kill himself because he had probably murdered someone. When Lorenzo pulled out a shotgun and held it to his head, Marcos thwarted the alleged suicide attempt. *Id.* at 23-24. Although Marcos did not know Lorenzo well, he knew Lorenzo's brothers, and seeing Lorenzo distraught made Marcos feel sorry and protective of Lorenzo. *Id.* at 39. Marcos did not want the young Lorenzo to "end up in the same

18

situation that I had just went through," meaning detention.  *Id.* at 24.

Marcos waited until Lorenzo's parent arrived and then left for his own grandmother's home.  There he learned that "everybody was calling" and "wanted to pick him up," so he and someone else left for Marcos' home.  *Id.* at 25.

Marcos maintains that he, Lorenzo and Carlos made a "pact," but his testimony does not reflect when that happened.  Moreover, his testimony on this point is inconsistent.  According to his testimony above, Marcos apparently decided to take responsibility for the shooting in Lorenzo's stead when Lorenzo became suicidal.  At that point Carlos was at home.  On the other hand, he claims that Carlos was also a part of the pact, but that they did not speak about the incident while in the car driving to Lorenzo's house.  *See id.* at 47.  According to Marcos, the terms of the "pact" were that Carlos and Lorenzo would turn Marcos in, but that they would not testify in court to the same.  *See id.* at 40-42, 46-47.

After leaving his grandmother's house, apparently Marcos did not proceed home.  Instead, he drove around, wanting to leave town but without any funds, and picked up some friends and went to their house.  *Id.* at 25.  While there, Lorenzo paged Marcos and Marcos returned the page.  Lorenzo, who was on another line with Carlos, told Marcos that the police had Carlos in custody and Carlos wanted to talk to Marcos.  Lorenzo asked if Marcos was "ready" and said he would kill himself if Marcos did not go through with turning himself in.
*Id.* at 26-27.  In order to save Lorenzo and assure Carlos would be released, Marcos maintains that he decided to turn himself in and take the blame.  *Id.* at 27.  Marcos asserts that when Carlos called from the police station he made incriminating statements, knowing the conversation was being recorded and that the police would be tracing the call, *id.* at 28-29, 45, 46.

After that conversation, Marcos calmly went out of the house, lit a cigarette, and allowed the police to arrest him.  *Id.* at 29.  He told them "you got me, man," *id.,* by which me meant "you caught me" "it's over," *id.* at 30.  He did not specifically say "you got <u>your</u> man."  *Id.* (emphasis added).  When he made his statement to the police, Marcos says that as a loyal friend, he simply put himself in Lorenzo's position and told them the story.  *Id.* at 31.  Moreover, when he helped the police search for the gun, Marcos says he intentionally misled them because, though he knew the gun would carry his prints, he was actually concerned about primer residue on Lorenzo.  *Id.* at 48.  At that time, Marcos knew something about primer residue because, wanting to join the military, he had "studied up on all that stuff."  *Id.* at 48.

Marcos maintained that although he "did not do the murder," he "took the wrap [sic] for everything."  *Id.* at 37.  He did so despite the fact that he had a "horrible experience" being locked up and did not want to go back to jail.  *Id.* at 38.  After his arrest, Carlos contacted Marcos because Carlos felt "bad" over covering for Lorenzo and wanted to tell the truth.  However, Carlos ended up shooting himself before trial.  *Id.* at 34.  Marcos thought there was a possibility that Lorenzo would come forward and confess, because Marcos had mentioned Lorenzo would only do two years for the murder.  However Lorenzo did not believe him and did not come forward.  *Id.* at 35.

According to Marcos, when Lorenzo testified for the State, he not only broke the pact by testifying but also by not admitting he was the shooter.  Furthermore, Lorenzo's testimony "destroyed" Marcos' self-defense strategy.  *Id.* at 43.  Although he heard Lorenzo identify him as the shooter and heard the officer's testimony about his inculpatory statements, Marcos  chose not to exercise his right to testify.  *See id.* at 43, 44.  Marcos chose not to take the stand despite this

testimony because his attorneys had convinced him that his "Lorenzo did it" version would not have helped him and he probably would have been found guilty. *Id.* at 52.

## II.  State Court Proceedings

On direct appeal of his conviction to the New Mexico Supreme Court, counsel for Petitioner raised six issues in the brief-in-chief, each of which was considered and rejected in the published opinion dated November 25, 1998.  The claims were that:  (1) the denial of the self-defense instructions violated due process; (2) failing to dismiss the charges against Marcos in light of the original charges against Eric violated due process; (3) redaction of portions of Marcos' statement violated due process and New Mexico Evidence Rule 11-106; (4) failure to present Eric's identification of Carlos to the grand jury violated due process and N.M.STAT.ANN § 31-6-11(B); (5) allowing Detective Romero to illustrate the definition of depraved mind murder for the grand jurors violated due process; (6) allowing the State to amend the Marcos indictment before trial violated due process and the New Mexico statute and rule that allows peremptory disqualification of the assigned judge.  *See Doc. 14,* Exh. E; *State v. Lucero,* 126 N.M. 552, 927 P.2d 1143 (N.M. 1998).

In the reply brief, counsel attempted to raise a new issue – that willful and deliberate murder and depraved mind murder are mutually-exclusive theories and convictions for both renders one of the convictions void – but the New Mexico Supreme Court struck the issue.  *See id.,* Exhs. G-I.  Lucero filed a motion for rehearing, which was denied on December 18, 1998, and the mandate issued the same day.  *See Doc. 14,* Exhs. L-M.  He did not file a petition for certiorari with the United States Supreme Court.

Instead, represented by another attorney, Lucero instituted state habeas proceedings on

June 10, 1999, where he raised three claims.  One claim, the "Eric charges" issue, was essentially identical to that raised on direct appeal, and the trial judge summarily dismissed this claim as without merit because it "was already heard and decided on appeal."  *See id.,* Exh, N (issue "C"); *id.,* Exh. O.  Counsel also raised the inconsistent verdicts claim that was stricken on direct appeal. *Exh. N* (issue "A").  The trial judge likewise summarily dismissed this claim because it "should have been raised on appeal."  *Id.,* Exh. O.

The final claim, as briefed in the original and amended state petitions, raised nine instances of ineffective assistance of counsel. That is, counsel was allegedly ineffective in:  (1) pursuing a self-defense strategy against Petitioner's wishes; (2) failing to object to the mutually-exclusive murder theories; (3) failing to raise inconsistency of the verdicts on appeal; (4) failing to investigate witnesses to corroborate Petitioner's claim that Lorenzo was the shooter; (5) failing to obtain an independent expert witness for the primer residue evidence; (6) failing to pursue a change of venue; (7) refusing to allow Petitioner to testify; (8) failing to request a lesser-included instruction based on Petitioner's intoxication; and (9) the cumulative effect of the alleged errors. Habeas counsel also argued that fundamental error occurred because Petitioner is factually innocent of the charges.  *See id.,* Exhs. N, P.

The trial judge ordered briefing on the ineffectiveness claims and held an evidentiary hearing where, among other things, Petitioner was permitted to testify about what he would have told the jury had he taken the stand during trial.  *See id.,* Exh. O-Q; *see also State Habeas Evid. Hrg 10/1/01; State Habeas Evid. Hrg. 10/2/01.*  The trial judge specifically ruled on some of the ineffectiveness issues during the evidentiary hearing, and thereafter issued an order that summarily denied relief.  *Doc. 14,* Exh. U.  The New Mexico Supreme Court denied certiorari on November

22

20, 2001.  *See id.,* Exhs. V-W.

Petitioner filed his federal habeas petition on July 3, 2002 and his amended petition July

30, 2002.  Additional pleadings followed.  As in the state court proceedings, Petitioner raises

these categories of issues:

> (1) the "Eric charges," *see Doc. 1* at unnumbered page; *see also Doc.
> 10* at 3-B(i);
>
> (2) inconsistency of the murder verdicts, *see Doc. 1* at 1 and
> unnumbered page;
>
> (3) ineffective assistance of trial counsel, *see Doc. 1* at 3-A, 7; *see also
> Doc. 10* at 3-A, 6, 11 and unnumbered page, for:
>
>> (a) pursuing a self-defense strategy against Petitioner's wishes;
>> (b) failing to investigate;
>> (c) failing to retain an expert;
>> (d) failing to pursue a change of venue;
>> (e) refusing to allow Petitioner to testify;
>> (f) failure to request a lesser-included instruction; and
>> (g) cumulative effect of counsel's errors;
>
> (4) ineffective assistance of appellate counsel in failing to raise
> inconsistency of the verdicts on appeal, *see Doc. 1* at 7; *Doc. 10* at
> 6; *Doc. 18* at 2; *see also Doc. 17;* and
>
> (5) unspecified fundamental error, *see Doc. 1* at 3-a; *Doc. 10* at 3-A (characterized as
> inconsistent verdicts issue).

Petitioner also raises a number of new issues and casts a new spin on some of the

exhausted issues.  None of these arguments, however, have been presented or addressed in any

state court proceeding.  The new issues/arguments are interrelated and fall into these categories:

> (6) trial court error (in not granting a continuance, *see Doc. 23* at 2,
> and not allowing testimony or evidence to counter the defense
> expert, *see id.* at 15);
>
> (7) denial of compulsory process (by not telling the jurors that the

Marcos bunch entered a pact to lie about who was the shooter, *see Doc. 10* at 11 and unnumbered page, *see also Doc. 17, Doc. 23;* and by not telling the jurors that Lorenzo was wearing the green shirt, *see Doc. 18* at 4);

(8) prosecutorial misconduct (in withdrawing the charges against Eric, *see Doc. 1* at unnumbered extra page; *see also Doc. 10* at 3-B(i); failing to disclose certain "favorable" evidence, *see Doc. 10* at 7-9; *see also Doc. 17;* and using Lorenzo's "perjured" testimony, *see Doc. 10* at 9; *see also Docs. 17, 18*);

(9) ineffective assistance of trial counsel (in handling the Eric charges issue, *see Doc. 1* at 7 and unnumbered page; *see also Doc. 10* at 7, 3-B(i); for depriving him of compulsory process, *see Doc. 1* at 9; not challenging Carlos' and Lorenzo's statements to police, *see Doc. 23* at 15; and not raising a gun powder residue issue, *see Doc. 24* at 3);

(10) ineffective assistance of appellate counsel "as in *Boyer v. State,*" *see Doc. 1* at 3-B; *see also Doc. 10* at 3-B; and

(11) fundamental error by virtue of inconsistent murder verdicts, *see Doc. 1* at 6.

## III.  Procedural Analysis

### A.  Federal Petition Is Timely

In another prior order, I set forth the background concerning whether Lucero's federal petition is timely under AEDPA's one-year limitations period.  I incorporate that discussion here by reference.  *See Doc. 25.*  In their motion to dismiss, Respondents conceded that the petition is timely under the state of the law at the time, but argued that Congress did not intend for petitioners to benefit from an additional ninety-day period in which to petition for certiorari in the Supreme Court of the United States.  They asked this court to revisit the issue.  *See Doc. 16* at 1-3; *see also Doc. 19* at 2.

I held the matter in abeyance to await the Supreme Court's decision in *United States v.*

24

*Clay,* which was issued March 4, 2003.  123 S. Ct. 1072 (2003); *see also Doc. 25.*  In a

unanimous decision, the Court reaffirmed that a conviction becomes final on direct review when

the Court "affirms the conviction on the merits . . . or denies a petition for a writ of certiorari, or

when the time for filing a certiorari petition expires," 123 S. Ct. at 1076, and held that this rule

applies for federal convictions as well as state convictions, *id.* at 1078-79.  Accordingly, the

instant petition is timely, and this aspect of Respondents' motion to dismiss should be denied.

### B.  Access To Courts Is A Noncognizable And Meritless Claim

In one pleading, Petitioner asserts that, contrary to *Lewis v. Casey,* 518 U.S. 343 (1996),

he has inadequate access to this court because some of his documents were lost and he has limited

access to a law library.  *Doc. 18* at 5.  A subsequent pleading belies his assertion about the

documents.  *See Doc. 23* (and twenty-three exhibits comprising hundreds of pages attached

thereto).

Access to the court claims are not cognizable as a grounds for habeas relief and instead

must be pursued in separate civil action under 42  U.S.C. § 1983.[11]  Moreover, any such suit by

Lucero would be unavailing.  As demonstrated by the remainder of these proposed findings,

Petitioner has no such claim because he cannot establish that the alleged denial of legal resources

---

[11]  *See United States v. Brittain,* 41 Fed. Appx. 246, 249 n.2 (10th Cir.) ("Mr. Brittain also appears to assert a claim for denial of access to the courts on the basis of his allegation that the various prisons at which he was incarcerated did not provide adequate legal materials for the visually impaired. Such a claim is properly brought as a *Bivens* [or § 1983 for state prisoners] action rather than as a request for habeas relief under section 2255."), *cert. denied,* 123 S. Ct. 294 (2002); *Turnboe v. Gundy,* 27 Fed. Appx. 339, 340 (6th Cir. 2001) ("In his timely appeal, Turnboe argues that his civil rights claims are cognizable in a habeas corpus petition. . . .  Upon review, we conclude that the district court properly dismissed Turnboe's petition. . . .  In this case, Turnboe objected to his transfer and his lack of access to legal materials.  These are conditions of confinement claims that should have been brought under § 1983."), *cert. denied,* 122 S. Ct. 2310 (2002).

has hindered his efforts to pursue a nonfrivolous claim in this suit.  *Lewis,* 518 U.S. at 353.

### *C.  The Court Will Not Review Issues 6 Through 11*

### *(1) Marcos Has No Further State Avenues In Which To Pursue The Claims*

As noted above, the issues I have numbered 6 through 11 were never presented to the

New Mexico courts.  The State's Answer notes that one of Plaintiff's claims is unexhausted and

alludes to the possibility of a procedural default, but does not expand on the notion or address the

other issues that are defaulted.  *See Doc. 14, ¶ 4; see also Docs. 15, 22.*  In any event, this Court

has discretion to raise the issue of procedural default  *sua sponte.  See e.g., Hardiman v.*

*Reynolds,* 971 F.2d 500, 505 (10th Cir. 1992).

The federal exhaustion requirement and procedural default doctrine are both related to

comity concerns that the State first be presented with the opportunity to rule on any federal

constitutional issues that implicate the validity of a conviction.[12]  Issues 6 through 11 could have

---

[12]    State courts, like federal courts, are obliged to enforce federal law.
Comity thus dictates that when a prisoner alleges that his continued
confinement for a state court conviction violates federal law, the state
courts should have the first opportunity to review this claim and provide
any necessary relief. . . .   This rule of comity reduces friction between the
state and federal court systems by avoiding the "unseem[liness]" of a
federal district court's overturning a state court conviction without the
state courts having had an opportunity to correct the constitutional
violation in the first instance.

*O'Sullivan v. Boerckel,* 526 U.S. 838, 844-45 (1999) (citations omitted).  Similarly,

The procedural default doctrine and its attendant "cause and prejudice"
standard are "grounded in concerns of comity and federalism," . . . and
apply alike whether the default in question occurred at trial, on appeal, or
on state collateral attack . . . .    "[A] habeas petitioner who has failed to
meet the State's procedural requirements for presenting his federal claims
has deprived the state courts of an opportunity to address those claims in
the first instance." . . .  We therefore require a prisoner to demonstrate
cause for his state-court default of any federal claim, and prejudice

been raised on direct appeal or as ineffectiveness claims in the postconviction proceedings.

However, except for claims of fundamental error or incapacity, issues not raised on direct appeal are considered waived if raised in New Mexico postconviction proceedings. *See State v. Gillihan,* 86 N.M. 439, 440, 524 P.2d 1335, 1336 (1974).  The other "exception" is ineffective assistance of counsel because records on direct appeal are generally insufficiently developed to resolve the issues. *See Duncan v. Kerby,* 115 N.M. 344, 346-47, 851 P.2d 466, 468-69 (N.M. 1993).  Furthermore, "New Mexico state courts will not consider any issues raised in a second post-conviction proceeding which could have been raised in the first [postconviction] proceeding." *Harris v. Williams,* 5 Fed. Appx. 831, 2001 WL 201962 (10th Cir. 2001).  The "narrow exception" to New Mexico's second post-conviction waiver rule, is "when the petitioner asserts 'fundamental error' in his trial." *Id.* (citing *Gilliahan*).  The New Mexico Supreme Court states that the

> doctrine of fundamental error should be applied sparingly, to prevent a miscarriage of justice, and not to excuse the failure to make proper objections in the court below.  With regard to a criminal conviction, the ***doctrine is resorted to only if the defendant's innocence appears indisputable or if the question of his [or her] guilt is so doubtful that it would shock the conscience to permit the conviction to stand. . . .  "If there is substantial evidence . . . to support the verdict of the jury, we will not resort to fundamental error***."

*State v. Reyes,* 132 N.M. 576, ___, 52 P.3d 948, 962 (2002) (citations and original material

_____

> therefrom, before the federal habeas court will consider the merits of that claim. . . .  The one exception to that rule . . . is the circumstance in which the habeas petitioner can demonstrate a sufficient probability that our failure to review his federal claim will result in a fundamental miscarriage of justice.

*Edwards v. Carpenter,* 529 U.S. 446, 451 (2000) (citations omitted).

omitted) (emphasis added).

Accordingly, Marcos has no additional avenues to pursue in the New Mexico state courts unless he meets the state fundamental error test. Based on the description of the evidence before the jurors above, Petitioner does not satisfy the state fundamental error standard. The State presented more than substantial evidence of Petitioner's guilt at trial, which supports the jurors' verdict. Moreover, and as discussed in more detail below, his assertion of innocence to his trial attorneys and to the trial judge at his sentencing, *see Trial Transcript Vol. XVII* at 13, and to this Court in these proceedings does not indisputably establish his innocence or bring the question of his guilt into such doubt as to shock the conscience. Accordingly, I find Issues 6 - 11 are procedurally defaulted.

### *(2) The Claims Are Procedurally Defaulted For Federal Habeas Purposes*

This Court may not review the merits of the procedurally-defaulted claims unless Marcos bears his burden and establishes: (1) cause for the default and actual prejudice, or (2) that a fundamental miscarriage of justice will result if the merits of the claim are not reached. *E.g., Johnson v. Champion,* 288 F.3d 1215, 1217 (10th Cir. 2002); *Demarest v. Price,* 130 F.3d 922, 942 (10th Cir. 1997). "The determination of cause and prejudice and of fundamental miscarriage of justice are both matters of federal law." *Demarest,* 130 F.3d at 942. Petitioner fails to meet any of these standards.

To establish cause, Marcos must show that "some objective factor external to the defense impeded [his] efforts to comply with the State's procedural rule." *Murray v. Carrier,* 477 U.S. 478, 488 (1986); *see also e.g., id.* at 489; *Shayesteh v. City of South Salt Lake,* 217 F.3d 1281, 1283 (10th Cir. 2000), *cert. denied,* 531 U.S. 1171 (2001). He could have raised all of the claims

that were not pursued on direct appeal as ineffectiveness issues in post-conviction proceedings, as well as the additional ineffectiveness issues he alleges.  That he was represented by counsel in post-conviction proceedings is of no consequence, because he is not constitutionally entitled to counsel in postconviction proceedings.  Hence, habeas counsel's ineffectiveness cannot provide the basis for finding cause for the procedural default.  *See Martinez v. Johnson,* 255 F.3d 229, 241 (5th Cir. 2001) (and decisions from the 4th, 8th, 9th, and 11th Circuits cited therein), *cert. denied,* 534 U.S. 1163 (2002); *see also Body v. Watkins,* 51 Fed. Appx. 807, 811 (10th Cir. 2002) ("we also agree with the district court that the conduct of Mr.  Body's counsel, even if ineffective or neglectful, cannot excuse his failure to exhaust state remedies").  Therefore, Marcos fails to establish cause.

To establish prejudice, Marcos must show "actual prejudice."  The Supreme Court has not precisely defined that phrase, but the Tenth Circuit has examined and determined how to evaluate the prejudice prong.

> Complicating this cause-and-prejudice inquiry is the fact that the Supreme Court has never "attempted to establish conclusively the contours of the standard." . . .  Nevertheless, certain general guidelines have emerged from the Court's jurisprudence.
>
> * * * * *
>
> The burden of showing prejudice is not an easy one. As a rule, the petitioner "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."   . . .  In other words, it is not enough to assert that an error "might have changed the outcome of the trial.". . .  ***Instead, a petitioner "must convince [a court] that 'there is a reasonable probability' that the result of the trial would have been different."*** . . . This "reasonable probability" standard does not require that a petitioner demonstrate he "would more likely than not have received a

> different verdict" without the claimed error. *Id.* at 289. Rather, the
> question is ***whether, considering the error, "he received a fair
> trial, understood as a trial resulting in a verdict worthy of
> confidence."*** . . .   Applying these standards, we have concluded
> petitioner did not establish prejudice where the jury did not
> consider newly required elements of a crime but its verdict
> "necessarily embraced the missing elements."

*Daniels v. United States,* 254 F.3d 1180, 1190-91 (10th Cir. 2001) (internal citations omitted)

(emphasis added).

    To establish the fundamental miscarriage of justice exception, Marcos must supplement his

constitutional claims with a "'colorable showing of factual innocence.'" *Herrera v. Collins,* 506

U.S. 390, 404 (1993) (quoting *Kuhlmann v. Wilson,* 477 U.S. 436, 454 (1986)); *see also e.g.,*

*Steele v. Young,* 11 F.3d 1518, 1522 (10th Cir. 1993); *Gonzales v. Jordan,* 37 Fed. Appx. 432,

436 (10th Cir. 2002).  This exception is a high standard to hurdle and only applies in a narrow set

of extraordinary circumstances.  To fall within the purview of this limited exception, Marcos must

support his allegations of innocence with "new reliable evidence- whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not

presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324 (1995); s*ee also e.g., Gonzales,* 37 Fed.

Appx. at 436; *Hawkins v. Hargett,* 28 Fed. Appx. 837, 839 (10th Cir. 2001).  A mere assertion of

innocence by Marcos is insufficient.  *See Brown v. Nelson,* 33 Fed. Appx. 976, 978 (10th Cir.

2002) ("Although Brown does claim to be actually innocent of the aggravated armed robbery for

which he was convicted . . . this assertion alone is inadequate to satisfy the manifest injustice

exception.").  Rather, the evidence must convince this court that  "***no reasonable juror*** would

have found [Marcos] guilty."  *Schlup,* 513 U.S. at 329 (emphasis added) ("The meaning of actual

innocence . . . does not merely require a showing that a reasonable doubt exists in the light of the

new evidence, but rather that no reasonable juror would have found the defendant guilty.").

In the context of Marcos' arguments, the only possible basis for finding prejudice or a fundamental miscarriage of justice is his assertion of innocence.  As corroboration for his assertion, he relies on the following:

! Lorenzo was wearing the green Sonics jersey that day, and a neighbor identified the shooter as the person in the green jersey; *Doc. 18* at 4;

! the officers knew Lorenzo was present at the shoot-out, but did not question him immediately after the incident or test his hands, *See Doc. 23,* Exh. 7 (Lorenzo was questioned three days after the incident); *Doc. 18* at 4;

! the lack of gunpowder residue on Marcos' hands when he was tested, *Doc. 24* at 2;

! the transcripts of the telephone calls taped by the police, which he characterizes as showing an obvious fabricated story between Marcos, Carlos and/or Lorenzo, *Doc. 18* at 6-7, 15; *see also Doc. 23,* Exhs. 5;

! Marcos claims that after his conviction,

> [m]any people appoached (sic) family members, who probably seen who actually did see the shooting, called, "crime stoppers," or related that Marcos was not the assasin (sic), or that Lorenzo Lucero bragged that 'he had murdered [Lynnae] and gotten away with it.  For fear of gang retribution to themselfs (sic) or family refuse to come forward and so state.  (Exh. 16) demonstrates that may seen Devine & Co. walking – seen Marcos & Co. standing, running, heard shots, sitting on front porch where [Lynnae] fell, but did not see who was shooting.  Out of 32 contacts or attempted contacts 16 heard shots[,] seen both groups, 16 didn't see or hear or would not answer the door.  The fear and apathy is demonstrated by (Exs. 17, 18) a hand written note, left anonymously in grandparents front yard.

*Doc. 23* at 13-14.

! Exhibit 16 to Petitioner's pleading, which are the 32 "homicide canvass questionnaires" the police collected at the scene.  Some of the questionnaires have obviously been annotated by Petitioner.  For example Carlos' mother told the police that "Eric has gun, has pulled it on her son in the past.  He shoots up the neighborhood

all the time" is annotated "seen Lorenzo's close (sic) . . . saw green jersey, saw what
Lorenzo was wearing he was at house all day." *Doc. 23,* Exh. 16 (Michelback
questionnaire). Another neighbor saw two "guys in jersey shirts -- skin heads -- [one]
blue shirt" and her questionnaire is annotated "seen us runin (sic) away." *Id.* (Welto
questionnaire). Another neighbor saw the "victims crossing the street at the time of
the shooting -- the girl fell down. Witnesses were setting (sic) in front of the house at
the time" is annotated "posibly (sic) seen who was shooting." *Id.* (Moya
questionnaire). The neighbor who saw "3 or 4 guys running backwards shooting" is
annotated as a "lie." *Id.* (Vaillanueva questionnaire). The rest of the questionnaires
indicate that the person heard shots and/or saw the victims afterward, or were not at
home or not answering the door. *See id.* The police interview sheets of the many
neighbors that indicate the person did not see and/or hear anything show that the
neighbors were afraid to tell what they knew because of their fear of gangs, *see Doc.
23* at 13-14; *see also id.,* Exh 16;

!   the two exhibits marked 17 to Petitioner's pleading, the first of which are the defense
    motion to preserve and subsequent orders granting defense "all the reports completed
    by personnel at scene," all "primer residue and ballistics tests," and all "tape recordings
    of police calls, filed investigation notes, APD personnel field communications, and
    other related phone or radio communications [e.g., 911 calls]." *Id.;*

!   an anonymous letter received by Lorenzo's grandmother on June 28, 1996 – during in
    the interim between the juror's guilty verdicts and the trial judge's sentencing hearing,
    *see Record Proper* at 168-80; *Trial Transcript Vol. XVII*), that stated "Lorenzo
    Lucero Killed Lynae (sic)," *Doc. 23,* Exh. 18; and,

!   the second exhibit 17, which is a police report made on March 25, 1997 – while
    Marcos' case was on direct appeal. The officer had contacted the recipient of the
    anonymous note which said "Desi killed Carlos," but she refused to let the officers
    take the note as evidence. *Doc. 23,* Exh. 17;

The anonymous post-trial and pre-sentencing letter, though "new," does not constitute

"reliable" evidence for obvious reasons. The anonymous note while the case was on appeal is

immaterial. Nor does the fact that neighbors told police they did not hear or see anything

conclusively or reliably probative of an inference that they knew Lorenzo was the shooter but

would not provide that information for fear of gang-related retaliation. None of the other

evidence Marcos relies upon is new. The green shirt Lorenzo was wearing, the lack of

gunpowder on Marcos' hand, and that Lorenzo was not among those tested for gunpowder residue all constitute evidence heard and considered by the jurors.

The suggestion the police failed to investigate Lorenzo as a suspect is not accurate. At trial, Officer Romero specifically testified that following the taped conversations and Marcos' statement, there was no need to investigate further. *Trial Transcript Vol. XIII* at 165. In fact, however, the police did question Lorenzo after Marcos' arrest and before doing so read him his rights. *See Doc. 23,* Exh. 7 at 2-4. They questioned him because Lorenzo's name was mentioned by others they questioned. *Id.* at 4. When asked "why don't you go ahead and just tell me from the beginning what happened," *id.,* Lorenzo first said that he "thought" Marcos was the shooter from their side, but that he was "not sure," *id.* at 5. Officer Romero informed Lorenzo that Marcos had already given a statement about what happened, and that he wanted Lorenzo to "[j]ust be up front and be open about the whole thing." *Id.* Lorenzo proceeded to describe in detail the events, including that: he handled Marcos' gun when loading it, *see id.* at 11-12, 23; Marcos fired first into the air, *id.* at 16; he wore the green shirt during the shooting but left it at Carlos' house afterward and changed into a blue one there, *id.* at 22-23; and Lorenzo was sure he did not do the shooting, rather Marcos did, *id.* at 24-25.

Furthermore, the jurors heard the taped conversations at trial and followed along with the transcripts while they listened. *See Trial Transcript Vol. XIII* at 161-163. I will set forth the conversations virtually in their entirety for context. Contrary to Marcos' characterization, they do not patently show an agreement to fabricate who did the shooting to cover for young Lorenzo. Rather, an equally plausible interpretation of the cryptic conversations is that the gun was either Carlos' or one he procured; that they agreed if the other two were in jeopardy of certain

33

conviction for the shooting, Marcos would come forward and take responsibility for what he had

done as well as blame Eric for provoking the shooting; and that upon his arrest Carlos begged

Marcos to come forward but not to disclose Carlos' role with the gun, which Marcos had thrown

away.  For example, when Carlos first called Lorenzo from the jail, their conversation began as

follows:

| | |
|---|---|
| [Lorenzo]: | Where? |
| [Carlos]: | The jail. |
| [Lorenzo]: | What happened? |
| [Carlos]: | They want Marc to come front. |
| [Lorenzo]: | Huh-uh. |
| [Carlos]: | Yeah, he – he's – he did it; right?  So, he did it, bro.  That's what they said.  And that he went to Diamond Shamrock, whatever. |
| [Lorenzo]: | Oh, you fucking – you told them or what? |
| [Carlos]: | What you told me to tell them. |
| [Lorenzo]: | You just told them that? |
| [Carlos]: | Yeah.  Well, Goofy [Marcos] was – yeah. |
| [Lorenzo]: | He said not to tell them unless they fucking -- |
| [Carlos]: | It's too late.  They already knew, hey.  They knew everything, bro. |
| [Lorenzo]: | What'd they say? |
| [Carlos]: | That we're going to go to my – they went to my house, and then they – they were going to – and I'm going to go down for murder, bro, if Goofy don't come front, bro. |
| [Lorenzo]: | Well, I'll go – |
| [Carlos]: | I'm going down for murder, bro, not any of you, hey.  And I didn't do shit, and you know I didn't do shit, bro. |
| [Lorenzo]: | Oh, shit, bro.  Well, call back in like five minutes. |
| [Carlos]: | Hey, Goofy – where's Goofy at? |
| [Lorenzo]: | I'm going to call him now.  Want his house number? |

*Doc. 23,* Exh. 5 at 1-2.  When Carlos and Marcos spoke, soon thereafter, this conversation took

place:

| | |
|---|---|
| [Carlos]: | Goofy. |
| [Marcos]: | Yeah. |
| [Carlos]: | What are you doing? |
| [Marcos]: | Nothing, hey.  What's going on [INAUDIBLE]? |
| [Carlos]: | I'm getting busted for something that you're supposed to – you know what? |

| | |
|---|---|
| [Marcos]: | Hmm? |
| [Carlos]: | Well, what – what – what happened?  Are you going to come front or what?  I want to get – I want – I didn't – you know I didn't do nothing, bro.  You have to just do what you were going to do, bro.  Remember? |
| [Marcos]: | Yeah. |
| [Carlos]: | Well, what's up, bro?  Because I'm – I didn't do nothing.  You know I didn't do nothing, bro.  You know that; right? |
| [Marcos]: | Yeah, I know. |
| [Carlos]: | Well, you – you know who did it.  You know you – you know what's up, Goofy?  You have to come front, bro. |
| [Marcos]: | I know. |
| [Carlos]: | Well, what's up, bro?  Because I'm not going to go down for something I didn't do, hey. |
| [Marcos]: | I know. |
| [Carlos]: | Well, what's up, bro?  Because I'm not going to go down for something I didn't do, hey. |
| [Marcos]: | What did they tell you? |
| [Carlos]: | They told me they know you – who you are and everything, bro.  They know your name.  They know everything, bro.  But they just – they – they just know everything, bro, so you're going to have to come front, bro.  All right? |
| [Marcos]: | All right. |
| [Carlos]: | And I don't know.  They want to know where you put the gun, hey. |
| [Marcos]: | They want to know where I put the gun? |
| [Carlos]: | Yeah. |
| [Marcos]: | We threw it in the ditch. |
| [Carlos]: | Hmm, well – well, you're going to have to come front, Goofy. |
| [Marcos]: | Well, what if we can't find the murder weapon? |
| [Carlos]: | Well, just someone – someone's still going to have to go down for it, because I didn't do it, hey. |
| [Marcos]: | I know. |
| [Carlos]: | And – |
| [Marcos]: | Why did they pick you for it? |
| [Carlos]: | Why?  Because they thought I did it.  I'm the closest right there,  *But, Goofy, you mom's already over there, anyway, bro.* |
| *[Marcos]:* | *Huh?* |
| *[Carlos]:* | *You're mom's already over there, anyway, bro.* |
| *[Marcos]:* | *Over where?* |
| *[Carlos]:* | *You know where, bro.* |
| *[Marcos]:* | *Oh.*[13] |

---

[13]  As best I can tell, the italicized portions of the conversation relating to Marcos' mother being in prison and Marcos allegedly suffering from schizophrenia were redacted in the version heard by the jurors.

| | |
|---|---|
| [Carlos]: | Just tell the, bro, Goofy.  All right? |
| [Marcos]: | All right.  I'm going to go. |
| [Carlos]: | You – tell them that – you know, what are you going to tell them, that you what? |
| [Marcos]: | That fucking – |
| [Carlos]: | You (INAUDIBLE) – |
| [Marcos]: | – Eric – I was walking to you house. |
| [Carlos]: | I know.  Well – |
| [Marcos]: | And all that shit. |
| [Carlos]: | What – |
| *[Marcos]:* | *And fucking I – and I – and I blacked out, fucking –* |
| *[Carlos]:* | *Well, you – you're – well, you're – well, you're schizophrenic; right?* |
| *[Marcos]:* | *Yeah.*[14] |
| [Carlos]: | So, you went out, and you went to Diamond Shamrock. |
| [Marcos]: | You – |
| [Carlos]: | Yeah, I – |
| [Marcos]: | called – |
| [Carlos]: | – ran – I ran to Diamond Shamrock.  I called, and someone brought me a gun. |
| [Carlos]: | Yeah.  Like you – and then – yeah, well, I'm busted, Goofy.  I'm going – I'm – you – you know I – I didn't do nothing, bro.  And you already told Lorenzo what you were going to do; right? |
| [Marcos]: | Yeah. |
| [Carlos]: | So, you got to do it, hey. |
| [Marcos]: | Yeah. |
| [Carlos]: | But, Goofy -- |
| [Marcos]: | Yeah. |
| [Carlos]: | – why, bro?  Why did it have to happen, hey? |
| [Marcos]: | What? |
| [Carlos]: | Why did this have to happen, bro, to me? |
| [Marcos]: | I don't know. |
| [Carlos]: | But you – see, Goofy, though – well, are you going to do right?  Are you going to – what – you're going to come front, right?  Because I'm not going to – I'm not going to do it, hey.  I'm – right, Goofy? |
| [Marcos]: | Yeah.  Fucking – |
| [Carlos]: | Why did you shoot? |
| [Marcos]: | Hmm? |
| [Carlos]: | Well, why – why in the hell did – did it happen, bro?  Why in the hell, bro? |
| [Marcos]: | Because, bro, fuck – |

---

*See Trial Transcript Sup. Vol.* at 17-19.

[14]   *See supra,* note 13.

| [Carlos]: | I know.  Because of – because of – |
| [Marcos]: | That pissed me off, hey. |
| [Carlos]: | What, because of – because of what's-his-name; right?  Because of Clifton and – and Eric; right? |
| [Marcos]: | Yeah. |
| [Carlos]: | Well, just come front, Goofy, and tell them, bro that you did it, bro.  All right? |
| [Marcos]: | All right.  I'm going to call Wetto [Lorenzo]. |

*Id.* at 4-8.  Thereafter, Carlos and Lorenzo had this conversation:

| [Carlos]: | Goofy's going to come front and he's going to tell them, hey. |
| [Lorenzo]: | I know.  I talked to him too. |
| [Carlos]: | He's going to tell them the truth.  But he said the – well, you don't know – you don't even know where the gun is, either, huh? |
| [Lorenzo]: | Huh? |
| [Carlos]: | Do you know where the gun is? |
| [Lorenzo]: | Not even. |
|  | * * * * * |
| [Lorenzo]: | And when – are you going be able go home tonight? |
| [Carlos]: | I don't know.  Probably not.  I'll probably just go be here for a long time, bro, a very long time, hey.  But I think they're going to have to go for you too because – to – so – so they could say that you didn't – well, so you could tell them that you didn't do nothing.  You now what I mean?  Whatever. |
| [Lorenzo]: | Huh-uh. |
| [Carlos]: | Yeah.  And I don't know – |
| [Lorenzo]: | When are they going to – if they come and get me, when are they going to come? |
| [Carlos]: | I don't know.  I don't know. |
| [Lorenzo]: | Because I was even going to sleep, hey. |
| [Carlos]: | Well, why did Goofy shoot, hey? |
| [Lorenzo]: | He – he said something about Eric shot at him or something. |

*Id.* at 9-10.

Thus, all of the evidence Marcos relies upon in support of his innocence does not qualify as the reliable new evidence necessary to bring him within the purview of the fundamental miscarriage of justice exception.  Even if I consider all of the evidence Marcos emphasizes, and the tenuous inferences to be drawn therefrom, this showing is insufficient for me to conclude that

no juror could have found him guilty or that there is a reasonable probability Marcos would have been acquitted.  As such, Marcos has not satisfied his burden of demonstrating prejudice or a fundamental miscarriage of justice.  Accordingly, I do not review the merits of Issues 6 - 11.

### (3)  *The Inconsistent Verdicts Issue Is Not Defaulted*

In Issues 1 – 5, Marcos raises the inconsistent verdicts issue as an independent claim as well as one of the arguments for counsel's alleged ineffectiveness.  In the state courts, he attempted to raise the issue in his reply on direct appeal where trial counsel argued that "conflicting verdicts amount to fundamental error [under state law] which can be raised at any time."  *Doc. 14,* Exh. G at 1.  Trial counsel also argued that they were ineffective in failing to raise the issue in the trial court or earlier.  *Id.*  ("Undersigned counsel was co-counsel in the trial court and was ineffective in not raising [conflicting verdicts] as a bar to the State's prosecution of Marcos Lucero under two mutually exclusive theories of murder.").  The prosecution moved to strike the issue on the ground that New Mexico rules and law prohibits raising a new issue in a reply brief.  *Id.,* Exh. H at 1.  They further argued that counsel should not be permitted to raise ineffectiveness "at this late stage," nor does the "appellate record" establish ineffectiveness.  *Id.*

Although the New Mexico Supreme Court granted the motion to strike, it did so in a conclusory fashion, saying only that it had considered the reply brief and motion.  It did not discuss whether it relied on the briefing procedural rule identified by the State, on the preservation procedural rule identified by defense counsel, or on the argument that post-conviction proceedings are the preferred vehicle for raising the ineffectiveness claim.  *See id.,* Exh. I.  Where a state decision does not clearly and expressly rely on an adequate procedural rule, the decision is not considered "independent" and therefore does not give rise to a potentially procedurally-

defaulted claim. *E.g., Ylst v. Nunnemaker,* 501 U.S. 797, 803-04 (1991); *Vernon v. Williams,* 208 F.3d 228, 2000 WL 286157 at *3 (10th Cir. 2000) (unpublished) ("While we might be able to conclude that the state court denied Petitioner's second petition for post-conviction relief on grounds of procedural default, we are not inclined to rely on a state procedural rule that the state court did not clearly rely upon;"citing *Jackson v. Shanks,* 143 F.3d 1313, 1318 (10th Cir.), *cert. denied,* 525 U.S. 950 (1998)), *cert. denied,* 531 U.S. 1039 (2000).

In Marcos' post-conviction proceedings, the trial judge likewise declined to review the inconsistent verdicts claim on its merits, saying it had been waived on direct appeal. However, state habeas counsel presented the issue as ineffectiveness of appellate counsel, which could have been raised in post-conviction proceedings under New Mexico law. *See Duncan,* 115 N.M. at 346-47, 851 P.2d at 468-69; *see also Doc. 14,* Exh. N at 2 (Issue "A" pleaded as inconsistent verdicts amount to denial of due process and not waived because it amounts to fundamental error; Issue "B" pleaded as ineffective assistance of counsel, including appellate counsel's failure to raise inconsistency of verdicts in timely fashion)); *id.,* Exh. O (denial of Issue "A" as "should have been raised on appeal," and allowing briefing on Claim "B" ineffectiveness); *State Habeas Evid. Hrg.* 10/2/02 at 77.

If the trial judge was held that in New Mexico an issue waived on direct appeal under state law could not be addressed as an ineffectiveness claim, I have found no cases so holding and such a ruling runs contrary to *Duncan.* If this is a new or emerging procedural rule in New Mexico, it is neither codified nor routinely followed and therefore cannot be deemed "adequate" for federal habeas procedural default purposes. *See Clayton v. Gibson,* 199 F.3d 1162, 1170-71 (10th Cir. 1999), *cert. denied,* 531 U.S. 838 (2000); *Maes v. Thomas,* 46 F.3d 979, 986-87 (10th Cir.), *cert.*

*denied,* 514 U.S. 1115 (1995); *Gonzales,* 37 Fed. Appx. at 435; *see also Lopez v. Williams,* 59

Fed. Appx. 307, 313 (10th Cir. 2003) (rule that failure to preserve issues at trial bar fundamental

error review is not firmly established or regularly followed and therefore not "adequate"); *Garner*

*v. Cody,* 105 F.3d 669, 1997 WL 3388 (10th  Cir. 1997) (holding Oklahoma rule that failure to

take direct appeal procedurally defaults claims later raised in post-conviction proceedings

inadequate stating, "This Hobson's choice cannot constitute an adequate state ground under the

controlling case law because it deprives [the petitioner] of any meaningful review of his ineffective

assistance claim.").  Moreover, I must look at the merits of the underlying inconsistent verdicts

issue in order to evaluate the ineffectiveness claim.  *E.g., Cargle v. Mullin,* 317 F.3d 1196, 1202-

03 (10th Cir. 2003).  Therefore, I do not find review of the inconsistent verdicts issue precluded.

### *(4)  Alternatively, Issues 6-11 Are Without Merit*

Alternatively, this court has the authority to deny unexhausted claims that are without

merit.  *E.g., Van Woudenberg ex rel. Foor v. Gibson,* 211 F.3d 560, 569 (10th Cir. 2000), *cert.*

*denied,* 531 U.S. 1161 (2001); *Brown v. Shanks,* 185 F.3d 1122, 1123 (10th Cir. 1999); 28 U.S.C.

§ 2254(b)(2).  Issues 6 through 11 are all inseperable from the central claims Marcos presents.

That is, whether counsel was ineffective in presenting a self-defense case when Marcos claimed

Lorenzo was really the shooter and whether he could be convicted of two alternative theories of

murder.  For fundamentally same reasons as set forth below, I find that all of the related claims

are likewise without merit.

## IV.  Substantive Analysis

I note at the outset that Petitioner's ineffective assistance of counsel claims seem to focus

on Mr. Hannum, the second chair attorney on his first murder case.  *See, e.g., Doc. 18* at 2 (Mr.

Hannum had never defended a murder case and this was his first and he made a mistake in the proceedings which cost the Petitioner a chance of having his case heard."). However, Mr. Gonzales was also part of the defense team and the attorneys' testimony in the evidentiary hearing was that they worked together on all aspects of the defense and agreed on the strategy. See *State Habeas Evid. Hrg.* 10/1/02 & 10/2/02.

### A. Strickland Standard In General

The two-prong test announced in *Strickland v. Washington,* 466 U.S. 668 (1984) governs ineffective assistance of counsel claims, and is "clearly established" federal law for AEDPA purposes. *See, e.g., Wiggins v. Smith,* ___ U.S. ___, ___, 123 S. Ct. 2527, 2535-36 (2003); *Upchurch,* 333 F.3d at 1163. An ineffective assistance of counsel claim fails if either of the *Strickland* prongs are not met. It is entirely appropriate for a habeas court to analyze the prejudice prong first and exclusively, if that is the easier course. *E.g., Scoggin v. Kaiser,* 186 F.3d 1203, 1207 (10th Cir.), *cert. denied,* 528 U.S. 953 (1999); *Cooks v. Ward,* 165 F.3d 1283, 1292-93 (10th Cir. 1998), *cert. denied,* 528 U.S. 834 (1999).

Marcos must first show that counsel's representation was "objectively unreasonable." *E.g., Clayton,* 199 F.3d at 1177; *see also Wiggins,* 123 S. Ct. at 2535 ("We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms.") (further quotation and citation omitted). In doing so, Marcos must overcome the "strong presumption" that counsel's conduct falls within the "wide range" of conduct that is considered to be trial strategy and is deemed "reasonable professional assistance." To be constitutionally ineffective, counsel's conduct "must have been completely unreasonable,

41

not merely wrong." *Bullock v. Carver,* 297 F.3d 1036, 1046-50 (10th Cir.) (and recent decisions

cited therein), cert. denied, 123 S. Ct. 703 (2002); *see also Bell,* 122 S. Ct. at 1863; *Moore v.*

*Gibson,* 195 F.3d 1152, 1178 (10th Cir. 1999), *cert. denied,* 530 U.S. 1208 (2000); *Hawkins v.*

*Hannigan,* 185 F.3d 1146, 1152 (10th Cir. 1999).

Marcos must also establish "prejudice" – that is, absent counsel's errors, there is a

"reasonable probability" that the outcome of the proceeding would have been different. E.g.,

*Wiggins,* 123 S. Ct. at 2542; *Moore,* 195 F.3d at 1178. "Reasonable probability" means that

confidence in the outcome is undermined. *E.g., Wiggins,* 123 S. Ct. at 2542; *Foster v. Ward,* 182

F.3d 1177, 1185 (10th Cir. 1999), *cert. denied,* 529 U.S. 1027 (2000).

## B. Change of Venue

In post-conviction proceedings, habeas counsel argued that trial counsel should have

pursued a change of venue motion because:  Marcos repeatedly asked them to, *Doc. 14, Exh.* P at

12; the news and newspapers carried coverage of  the murder portraying Lynnae as the

sympathetic victim of a "homicidal gang member," *id.;* the jury pool was familiar with the case

through the media coverage, *id.;* and the jurors "complain[ed] in a note to the Court that they

were uncomfortable with all the publicity," *id.* at 13.  The trial judge summarily denied habeas

relief on the ground that no evidence was submitted on the issue.  *State Habeas Evid. Hrg.*

10/2/02 at 78.  Since the trial judge was presented with the claim, but failed to address it on the

merits, I review it independently under the applicable AEDPA standards.  *E.g., Hawkins v.*

*Mullin,* 291 F.3d 658, 674 (10th Cir. 2002), *cert. denied,* 123 S. Ct. 1012 (2003); *Neill v. Gibson,*

278 F.3d 1044, 1058 n.6 (10th Cir. 2001), *cert. denied,* 123 S. Ct. 145 (2002); *Aycox v. Lytle,* 196

F.3d 1174, 1177 (10th Cir. 1999).

In these proceedings, Marcos submitted one newspaper article dated two days after the shooting – November 4, 1995. *Doc. 23,* Exh. 13. Furthermore, I have read the entire trial transcript, including the extensive voir dire. Both the trial court and defense counsel questioned the more than eighty prospective jurors on the panel about pretrial publicity and the court inquired whether the jurors who responded could be impartial. *See Trial Transcript Vol. X* at 11-14, 23-43; 122-151. At defense counsel's request, the court then conducted individual voir dire of certain jurors separate from the panel. *See Trial Transcript Vol. XI* at 93-95.

A number of the individual voir dire interviewees consisted of prospective jurors who indicated they had heard something about the case. Generally, the prospective jurors stated that they believed they may have heard something about the case and were vague about details and/or recalled that the news coverage itself was of a routine nature. Despite recalling something about the case from somewhere, the vast majority of prospective jurors indicated that their recollections would have no bearing on their decision or impartiality. Moreover, defense counsel, among other things, thoroughly questioned the prospective jurors about their views on the presumption of innocence and a defendant's Fifth Amendment privilege and gang membership. The prospective jurors did not display a hostile attitude toward the concepts or Marcos, nor did they display a preconceived belief in his guilt.

None of the jurors who indicated they may have problems being impartial were seated on the jury. *See Trial Transcript Vol. X* at 23-43, 125-151; *Trial Transcript XI* at 101-163; *see also Trial Transcript Vol XV* at 65 (the two alternates who were excused prior to deliberations). One juror had a tenuous and remote connection with the victim – years earlier her husband played in the same basketball league as Lynnae's father. However, she was emphatic in her ability to be

impartial, and defense counsel did not use one of its available peremptory challenges to strike her from the panel.  *See Trial Transcript X* at 136-40; *Trial Transcript XI* at 161.

The jury "note" to which habeas counsel referred is not of record.  *Compare Doc. 14, Exh. P, with Record Proper.*  It is apparent from a reading of the entire record that the media was not present until the last day of trial.  The last item of business before the State rested was for the jurors to view the scene.  Before doing so, among other things, the trial judge instructed them that

> there may be members of the news media at the scene.  These are public streets, and that's fine.  I have instructed them, and that's the form of an order from me, that they are not to photograph any of you in any way that you can be identified.  There are times in New Mexico when cameras are permitted in the courtroom, and we haven't had any yet that I am aware of.  I don't know if we will at any point.  But the instructions ware very clear that the jurors are not to be identified and no photographs of jurors' faces will be shown to the public, and one thing that sometimes happens, and I have had this happen in cases before where sometimes in raw footage they may accidentally get somebody's face but that's edited out.  That's not shown on television.

*Trial Transcript Vol. XIV* at 12.

The portion of the transcript Petitioner cited to support the proposition that the jurors were "surrounded" by a "media circus" *Doc. 14,* Exh. P at 13, consists of the trial judge's instructions to the jurors after the close of the evidence before excusing them for the night that same day.  After explaining that the case would proceed to an instructions conference, with instructions, closing arguments, and submission of the case to begin the next morning, the trial judge said:

> There is one instruction I want to give you at this time, however. Cameras are allowed in the courts of this state under certain guidelines.  In order not to distract you they will be located in designated areas of the courtroom.  In the event any member of the

jury is distracted by any member of the news media, you should immediately advise me.  The news media has been instructed not to film the jury or any member of the jury whether in the courtroom or outside the courtroom.  The cameras may be allowed to photography the testimony of certain witnesses and not others, or only portions of the testimony of some witnesses.  You are not to draw any inferences or conclusions whatsoever from this fact.

     *[Explaining they would be excused for the rest of the day and when to resume the following morning.]*  Meanwhile, remember my admonitions not to talk the anybody about the case, let anybody talk to you about it, avoiding news accounts.  There was some indication of some media attention on the field trip and there's a camera in the courtroom this afternoon.  There may be something.  You are in the best position to make decision on the case based on what you hear and see on (sic) the courtroom, not based on what you see on televison and read in the newspaper. You know that.  So please don't pay any attention to that stuff.  We will see you tomorrow morning.

*Trial Transcript Vol. XIV* at 55-57.

To establish a due process violation in the change of venue motion context, Marcos bears the burden of demonstrating either presumed or actual prejudice.  The fleeting and routine news accounts, the responses of the prospective jurors who were ultimately seated, and the presence of cameras in the courtroom at the end of the trial do not meet either criteria.  The simple showing here that jurors had a vague notion about the case from the media does not establish the pervasive and irrepressible hostile attitude necessary to meet the rare and extreme circumstances where prejudice will be presumed.  Nor does the belated and controlled presence of the media in the courtroom amount to a "frenzy" or "circus atmosphere."   Moreover, the seating of an impartial and nonhostile jury following thorough voir dire does not establish "actual prejudice" in this context.  *See Hale v. Gibson,* 227 F.3d 1298,1131-34 (10th Cir. 2000), *cert. denied,* 533 U.S. 957 (2001).

Having failed to establish any basis for a change of venue motion, Marcos has made no showing that trial counsel was either ineffective or that he was prejudiced.  Accordingly, I find this claim without merit.

### C.  Failure To Investigate/Failure To Call A Different Expert Witness/Choosing Self-Defense Strategy/Refusing To Allow Petitioner To Testify

### (1)  State Habeas Proceedings

The next four alleged instances of ineffectiveness center around the strategy trial counsel chose, given Marcos' confession.  Marcos essentially repeats the arguments habeas counsel made in the state proceeding.  There, habeas counsel argued that a self-defense strategy was not viable from the outset, yet trial counsel persuaded Marcos not to testify.  *See Doc. 14,* Exh. P at 8, 13. Habeas counsel further argued that, had trial counsel investigated, they could have amassed evidence to corroborate Marcos' recantation.  Specifically,

> Trial counsel failed to investigate available defense witnesses who could have corroborated Petitioner's claims [of innocence].  Counsel knew that Petitioner did not kill Lynnae Lucero, but they failed to pursue a significant investigation to prove that someone else did.
>
> Petitioner told his attorneys that Carlos and Lorenzo were armed on the day of Lynnae Lucero's death, and that Lorenzo fired the fatal shot. Yet counsel never sought to prove this claim based on the available evidence.  For example, counsel was aware that Lorenzo Lucero admitted holding a gun on the day of the shooting, and also admitted loading the gun. . . .    In addition, one independent eyewitness to the shooting was certain the shooter wore a green shirt . . . and counsel knew that Lorenzo Lucero was the only person wearing a green shirt on that day. . . .  Finally, although the police took primer residue samples from multiple suspects, the police never conducted such a test on Lorenzo Lucero.  Despite all of this circumstantial evidence, counsel nonetheless made no meaningful effort to investigate further whether there was any other evidence to demonstrate that Lorenzo Lucero may have been responsible for this crime.
>
> In addition, counsel was aware that Petitioner had recanted his statement to the police only hours after he made it.  Petitioner told trial counsel that shortly after his arrest he told his mother, his grandmother,

and other members of this family that he did not shoot Lynnae.  However, despite this information, counsel failed to seriously investigate whether any of Petitioner's family could have testified to these prior consistent statements.

Counsels' failure of investigation prejudiced Petitioner.  In *Smith v. New Mexico Department of Corrections,* 50 F.3d 801 (10th Cir. 1995)[*cert. denied sub nom. Mondragon v. Smith,* 516 U.S. 905 (1995)], the Tenth Circuit Court of Appeals recognized that the most powerful and material evidence a defendant can produce in a homicide prosecution is evidence that someone else may have been responsible for the victim's death.  *Id.* at pp. 829-830.  The *Smith* court concluded that the failure to produce such evidence could easily undermine a court's confidence in the outcome of a trial.  *Id.* at p. 830.  Petitioner contends that this Court must reach the same conclusion with respect to his trial counsel's failure to demonstrate the identity of the true killer in this case.

*Id.,* at 9-10 (citations to Trial Transcript omitted).  As for the expert, habeas counsel argued that:

The results of the primer residue tests conducted on Petitioner were inconclusive.  Nevertheless, despite the central importance which the defense attached to these results in pretrial proceedings, the evidence of the gun shot residue was never effectively presented to the jury.  In particular – despite repeated promises to the Court and to the Petitioner – trial counsel did not present a defense expert to reexamine the tests or re-interpret the results.  Instead, counsel relied on the testimony of Marc Adams (from the Albuquerque Police Department) to explain the results of the primer residue test, and even then counsel never demonstrated that other witnesses had at least four times the amount of the primer residue on their hands as Petitioner.

Petitioner was prejudiced by counsel's failure to present expert testimony on the primer residue test.  A close analysis of the primer residue tests in this case may have further excluded Petitioner while implicating others, including Lorenzo Lucero.  In addition, the results of the primer residue test provided circumstantial evidence in support of his claim that Carlos Garcia and Lorenzo Lucero were armed with firearms that day, not Petitioner.

*Id.* at 11.

The trial judge identified the correct standard under *Strickland.  See e.g., State Habeas Evid. Hrg. 10/1/02* at 24-26, 58, 53, 59.  At the end of the hearing, he set forth in detail his

47

reasons why he concluded counsels' chosen strategy was not unreasonable and why Petitioner

was not prejudiced.

What they ended up doing and ended up happening in this case is a decision was made to go for a claim of self-defense, flawed as it potentially is, they looked at it. Mr Gonzales testified that he saw no cases that dealt with a gun being shot up in the air. There's no cases that I've seen or presented to me that were available to them at that time.

Now we have State v. Marcos Lucero as a case that talks about that. But there's no case directly on point. From their testimony and from looking at the situation as best I could from having seen the trial and trying to think about what defense counsel might have been thinking and going through at the time and dealing with the case, they had a potential for self-defense that they were going to give it a try or potentially the perceived it to be an incredible full defense "I didn't do it" to the end.

And what they wound up with was not a self-defense after I excluded the instruction, but they still had the potential for something less than first degree. They had a second degree instruction. They had a voluntary manslaughter instruction.

And as I perceive it had they had the self-defense instruction, the jury would have to go through a stepdown process, first degree, second degree, voluntary and with a self-defense instruction the jury would have to find beyond a reasonable doubt it was not in fact self-defense. They would have to look at all those things.

If you sort of rank these things, Mr. Lucero had a potential for something less than first degree at least with this choice that was made if not a full defense of self-defense as opposed to an absolute all or nothing.

And I have to say after listening to the testimony of Mr. Lucero – and, Mr. Lucero, I wasn't there, obviously. So I have to go on what I hear and see in the courtroom and based on common sense I try to accumulate over the years, but I didn't perceive Mr. Lucero's testimony as credible.

And the reason that's relevant and the reason I'm saying something about that there are some things he said I did think were credible and I think that he said some things that, you now, maybe went a little further than what his attorneys were saying. He testified that he had the – you know, he understood that he could have testified during the course of the trial and that he didn't want to throw a monkey wrench in what the defense attorneys talked to him about and strategized over.

With respect to his descriptions of what happened that night whether or not he's in fact telling the truth I don't believe a reasonable jury would buy that. And, frankly, I don't think the jury would have stayed out as long as they did.

So on two levels I don't believe that the attorneys were ineffective in this case. They chose a strategy and we have to look at it from their perspective at the time and Strickland says that. We can't look at it from the perspective of State v. Lucero having been decided.

They chose the best defense they had under the circumstances. They had two bad choices, they were caught between the devil and the deep blue sea in the options they had. The defense they chose did not work, but at least they had the opportunity to argue for something less than first degree as opposed to I don't know that you get a second degree or voluntary instruction on the theory of I didn't do it at all. I don't know that they would have submitted it. I don't want to speculate on that. They wouldn't have had legitimate argument for it either.

So I don't think they had a good choice available to them. I think they did the best they could under a difficult situation. I am in no way saying they didn't exercise skill of reasonably competent attorney. And, frankly, my perception is they did the best they could with what they had. You can't Monday-morning quarterback. You can't use 20-20 hindsight obviously, the standard set up by Strickland, even though the temptation is there to do that.

In respect to prejudice I don't perceive there to be an error. If I were to perceive this as an error I don't think there's any reasonable possibility much less a reasonable probability that a reasonable jury would have gone differently.

*State Habeas Evid. Hrg. 10/2/02* at 72-75. The trial judge did not address the specific issues such as failure to investigate and failure to present an expert, on the ground that no evidence was submitted on the issue. As with change of venue, I review those issues independently. *See id.* at 78.

### (2)  Specific Application Of Strickland To Such Arguments

Where, as here, the basis for an ineffectiveness claim arises out counsel's choice of a particular trial strategy, the proper inquiry by this Court includes deference to counsel's choice under *Strickland*. The Supreme Court recently reemphasized that:

> strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely

49

> to the extent that reasonable professional judgment support the limitations
> in investigation.  In other words, counsel has a duty to make a reasonable
> decision that makes particular investigations unnecessary.  In any
> ineffectiveness case, a particular decision not to investigate must be directly
> assessed for reasonableness in all the circumstances, applying a heavy
> measure of deference to counsel's judgments.

*Wiggins,* 123 S. Ct at 2535 (quoting *Strickland,* 466 U.S. at 690-91); *see also Hooper v. Mullin,*

314 F.3d 1162, 1170-71 (10th Cir. 2002), *petition for cert. filed. 5/16/03.*  While the "mere

incantation of strategy does not insulate attorney behavior from review," *Hooper,* 314 F.3d at

1169 (internal quotations and citations omitted), my evaluation of objective reasonableness must

make "every effort to eliminate the distorting effects of hindsight . . . and evaluate the conduct

from counsel's perspective [and the circumstances] at the time," *id.* at 1169 (internal quotations

and citations omitted); *see also e.g., Bell,* 535 U.S. at 702; *Hooper,* 297 F.3d at 1048, 1050,

1052; *Fisher v. Gibson,* 282 F.3d 1283, 1293 (10th Cir. 2002); *Romano v. Gibson,* 278 F.3d

1145, 1154 (10th Cir. 2002).

Also,

> [w]hen an ineffective assistance claim centers on a failure to
> investigate and elicit testimony from witnesses, the petitioner must
> "demonstrate, with some precision, the content of the testimony
> they would have given at trial." *Lawrence v. Armontrout,* 900 F.2d
> 127, 130 (8th Cir. 1990) (quotation omitted).  The lack of a specific,
> affirmative showing of any exculpatory evidence leaves Martinez's
> claim well short of the prejudice required by *Strickland.  See Patel
> v. United States,* 19 F.3d 1231, 1237 (7th Cir. 1994) (holding no
> prejudice to petitioner who failed to make specific, affirmative
> showing that absent witness's testimony would have affected
> outcome of trial); *see also Foster v. Ward,* 182 F.3d 1177, 1185
> (10th Cir. 1999) (concluding that defense counsel's failure to contact
> or investigate alibi witnesses insufficient to establish prejudice),
> *cert. denied,* 529 U.S. 1027 (2000).  In light of our conclusion that
> Martinez has not established prejudice, we end our *Strickland*
> analysis.  *See id.* at 1184.

*Martinez v. Tafoya,* 13 Fed. Appx. 873, 877 (10th Cir. 2001)

### (3)  *Marcos Fails To Establish Either Strickland Prong*

Because the issues are interrelated, it is impossible, and indeed, improper, to evaluate them in isolation.  These ineffectiveness arguments before the trial judge and me entirely ignore the fact that Marcos essentially confessed in the taped telephone calls prior to his arrest and in fact confessed in detail after his arrest.  Moreover, the rest of the prosecution evidence corroborated the confession.  Faced with the option of trying to recant the confession or pursuing the self-defense angle, counsel believed the latter was the better course.  As noted in the factual background section, counsel believed they had a viable self-defense theory and that it would be ill-advised to pursue the explanation Marcos wanted to proffer given the prosecution's evidence.[15]  And, as lead counsel explained at the evidentiary hearing:

> in terms of what defense we chose and Mr. Lucero's actually not testifying, as I said, we discussed the evidence over the course of several months, several hearings that we had, meetings we had with the Judge in pretrial conference, and over the course of numerous witness interviews where we were getting firsthand a much clearer picture of that the State's evidence was going to be, we discussed this with Mr. Lucero as we were doing this.

> * * * * *

> Q:  And what advice did you give Mr. Lucero regarding why it was more beneficial to adopt the defense's proposed strategy as opposed to him testifying and his claim that he was not the shooter?

> A:  As I recall, when we talked with Mr. Lucero about that defense that he

---

[15]  *See supra,* § I.C.; *see also, e.g., State Habeas Evid. Hrg. 10/2/02* at 32 ("Given the alternative of what we considered to be a viable self-defense claim it would probably be foolish to go with recanting the confession defense."); *id.* ("It seemed – we had two choices.  We had – we could either go with a self-defense claim, which we thought this a good basis in law and fact or to go with this attempt to recant a fairly detailed confession.  And given those two options we thought it was by far the better option to go with the self-defense claim.").

wanted to propose, which would be built around his testimony, we talked about the decision that the jury would have to make in deciding whether he was guilty or not guilty of the crimes that he was charged with.

We told Mr. Lucero that if he took the witness stand in his own defense and claimed that he did not fire a gun at all much less kill the woman who was killed that it would place his credibility right before the jury.

And against his statements and his testimony would be placed the testimony of other witnesses who claimed that he did in fact have gun and who did fire shots one of which killed the young woman as well as his own statements.  One of which was a reported confession, statement to police authorities that he had in fact fired the gun, which he referred to the gun as the murder weapon.

And there was another telephone call, a setup where he was tape recorded and saying things to the effect that he already fired the gun.  That he had fired a gun.  It was either clear or could be inferred that he had fired the shots that killed the young woman.

So against the backdrop of all of this evidence Mr. Hannum and I explained to Mr. Lucero that his testimony would basically stand alone and that in any case whether it's murder or burglary or shoplifting, a person who is the defendant in the case who doesn't have other witnesses to support his or her account is in a very difficult position to persuade a jury that he's not guilty of the crimes charged in the face of State's evidence that so indicates.  That was why our opinion of the defense he wanted to mount that was centered around that was built around his testimony would not be credible.

Whereas the defense based on self-defense where there was ample evidence from other witnesses, including himself, that he had fired a pistol and that there was very clear evidence of provocation because Mr. Devine had fired at him earlier in the afternoon and then moments before the woman was injured and killed, we felt that that was a strong basis for self-defense and having the Court give us an instruction on self-defense.

*State Habeas Evid. Hrg. 10/2/02* at 47-51.

I find that counsel did not make an uninformed snap judgment in deciding which course to

pursue, nor did they make the decision without discussing it with Marcos.  Before the trial, for

example, while the defense had not yet identified any witnesses, it did "have an investigator in the

field who [was] looking to see if there are other witnesses besides those that [the defense] found [via] discovery [from the prosecution]." *Trial Transcript Vol. II* at 4-5. Furthermore, they did speak with Marcos' family, *Trial Transcript Vol. IV* at 8, and were consulting with an expert. Trial counsel did not believe there were important witnesses they had not interviewed. *State Habeas Evid. Hrg. 10/1/02* at 33-34, 60. Thus, I am not faced with a situation where counsel failed to investigate prior to trial and had little familiarity with the issues and facts. *Compare, Fisher v. Gibson,* 282 F.3d 1283 (10th Cir. 2002); *Hooper,* 314 F.3d at 1171.

Nor is this a situation where counsel was ignorant of the applicable law. Counsel were aware that an initial aggressor could not claim self-defense, but reasoned that because of the Eric incident shortly before the shoot out and Marcos' "warning shot," they would receive an instruction on it. From counsel's perspective at the time, they were surprised that the trial judge did not give the instruction. Furthermore, they were unaware of anything indicating that there was no legal basis for their position under the facts of the two encounters. Indeed, the trial court considered the issue carefully at trial, and at the habeas evidentiary hearing reiterated that he knew of no law directly on point at the time. *See supra,* § I.C.; *see also State Habeas Evid. Hrg.* at 17-18, 33, 39, 52-54, 61-62.

In context and at the time the decision was made, counsel's decision to pursue the self-defense theory was not unreasonable. As set forth in the factual background, the State's evidence was strong. In contrast, the circumstantial evidence defense counsel could have presented to try and bolster a recantation after confession was scant and weak.

First, the timing of Marcos' recantation was inherently suspect, coming as it did after the incriminating taped telephone conversation and his confession to the police. Thus, the credibility

53

of his recantation and subsequent testimony indeed would have suffered tremendously.  Second, Marcos' relatives were not present at the shooting.  Their bias would have been obvious had they testified to his assertions of innocence.  Third, none of the other people Marcos himself alleges "knew" of his innocence after the fact were present at the shooting, even assuming that they could have been persuaded to come forward and testify about what they heard and further assuming that their testimony would have been admitted over hearsay objections.  Fourth, the jurors already knew that Valencia testified that the youth in the green shirt was the shooter and that Lorenzo was wearing the green shirt.  However, both Valencia and Sandoval saw the events from practically the same spot, yet one reported all three of the Marcos bunch shooting, the other reported only one shooting.  While their testimony was crucial for the timing of the shots and which group shot first, because of the distance from which they observed the events, they could not precisely identify the shooter with any degree of certainty.

Finally, the primer residue evidence, as it stood, gave Marcos a basis for argument, regardless of whether a test for Lorenzo came out positive or negative.  For this reason and as borne out by the state record, contrary to habeas counsel's characterization of  independent expert testimony as "central," I conclude that trial counsel saw the issue for the red herring that it was.[16]  Moreover, neither habeas counsel nor Marcos tender, much less present with any

---

[16]  Two weeks before the originally scheduled trial, defense counsel moved to reschedule the trial from April 29, 1996 to September 20, 1996.  *Record Proper* at 46, 52 (in form of a Rule 5-604 petition).  As grounds, among several other things, counsel argued that they wanted an independent expert witness from California to review the results of the primer residue tests and were seeking approval of funds to retain him.  However, the expert would be unable to testify if the April 29th trial remained scheduled.  *Id.* at 48-49; *see also id.* at 58-64 (same in form of a motion to continue).  At a subsequent hearing, counsel explained that the primer residue tests were "quite unusual" because only the victims tested positive.  *Trial Transcript Vol. III* at 5.  Therefore, defense counsel though he "***might*** want to have these results examined," *id.* at 6 (emphasis added), to "consult with and to have the results of Marc Adams' testing of

precision, what the independent expert may have concluded.[17]

The observation from the Tenth Circuit decision habeas counsel cited in support of his arguments is inapposite here.  There, the case involved a murder to which there were no witnesses to the actual shooting and the prosecution withheld a police report concerning the investigation of the other suspect for the murder.  *See Smith,* 50 F.3d at 822-30.  The case before me, however, involves counsel's choice of one plausible defense over another after more than adequate investigation.  Choices under those circumstances are not unreasonable.[18]  It was only in

---

primer residue kits examined, critiqued and ***possibly*** to bring this expert witness . . . for testimony at the trial," *id.* at 4 (emphasis added).  The expert had assisted counsel in preparing to interview with Marc Adams and, although counsel could not identify what their expert may say and the trial judge questioned whether any such testimony would help either side, *see id.* at 14-15, 17, counsel wanted to ascertain "whether those results can be interpreted differently to show Marcos Lucero was negative and not just inconclusive, but negative; and that Carlos Garcia was positive, not just inconclusive, but positive, which would be very exculpatory," *id.* at 17.  The prosecution maintained that  evidence of primer residue should be excluded as irrelevant, because Marc Adams would testify that the residue can be transferred or washed off.  *See id.* at 80-81; *see also Trial Transcript Vol. III* at 16-17, 23 (prosecution's position was that results were neither inculpatory or exculpatory because primer residue can be washed off, transferred to other substances or people, and one of the components is naturally found in New Mexico soil).  The trial judge agreed in theory, finding defense counsel's basis for a continuance speculative, but ultimately allowed the defense to explore the evidence.  *See id.* at 26-28.  In later proceedings, trial counsel agreed that if the California expert gave the same explanation for the results as Marc Adams, then defense counsel, did not "need to bring that expert in for trial."  *Trial Transcript Vol. IV* at 24.  Defense counsel ""couldn't agree more."  *Id.*  Thereafter, trial counsel said expert was a "very important part of his defense." *Trial Transcript Vol. VII* at 15, but the trial court pointed out that counsel had not yet proffered what the expert may be able to say to assist the defense, *id.* at 16-17.

[17]  The trial judge appears to have reached the same conclusion in what looks like a handwritten notation him on habeas counsel's brief that says "denied unless expert is presented."  *Doc. 14,* Exh. P at 10.

[18]  *See e.g., Slaughter v. Mullin,* 2003 WL 12300287 at *7 (10th Cir. 6/6/03) ("it was objectively reasonable for defense counsel not to rely solely on Slaughter's alibi defense, which was far from airtight. . . .  Furthermore, the circumstantial evidence of Slaughter's guilt was extensive . . .") (and cases cited therein); id. at 11 ("in light of the further obstacles defense counsel would have faced in assertion such a defense, we cannot conclude that it was objectively unreasonable for defense counsel to have chosen between the two plausible defenses and decided to not assert a defense blaming Gullotto, but, instead, to argue that Cecilia Johnson acting on her own and unbeknownst to Slaughter, had killed the victims."); *Charm v. Mullin,* 37 Fed. Appx. 475 (10th Cir. 2002) (counsel was not unreasonable nor was prejudice

retrospect – that is, after the trial judge disallowed the self-defense instruction and the New Mexico Supreme Court affirmed on appeal – that counsel believed their chosen strategy to be erroneous and ineffective.  At the time they believed it a viable defense based on the law and facts of the case.  *See supra,* § I.C.; *see also State Habeas Evid. Hrg. 10/1/02* at 10, 14, 19-20, 28, 50-51, 56.  Counsel are not required to be clairvoyant and are not ineffective for providing objectively reasonable advice at the time it was given which later turns out to be mistaken.  *E.g., Bullock,* 297 F.3d at 1052 (and decisions cited therein).

Because counsels' chosen strategy was objectively reasonable, Marcos fails to meet the first *Strickland* prong.  That alone is grounds for finding these allegations of ineffectiveness without merit.  Because there was scant circumstantial evidence to support an actual innocence defense and ample evidence to support a guilty verdict, I find the result would not have been different had counsel pursued that avenue.  Accordingly, I conclude the trial judge's decision denying habeas corpus is neither contrary to nor an unreasonable application of the Strickland principles.

### C.  Failure To Request Lesser-Included Instruction On Intoxication

Habeas counsel argued that because Petitioner was using LSD and marijuana on the day in question, trial counsel should have requested a lesser-offense instruction based on intoxication, whereby the jurors might have found him only guilty of second-degree murder.  *Doc. 14,* Exh. P. at 14-15.  The trial judge did not address this issue.

---

established; death penalty-eligible murder case involving overwhelming evidence of guilt, defendant's detailed taped confession, and very minimal evidence of intoxication; counsel's strategy was to admit State could produce sufficient evidence in trial phase in order to preserve credibility for the penalty phase) (and cases cited therein).

The exculpatory defense of intoxication is not available in New Mexico if there is no evidence that the intoxication rendered Petitioner incapable of acting purposefully.  *E.g., State v. Privett,* 104 N.M. 79, 82, 717 P.2d 55, 58 (1986) (citing *State v. Luna,* 93 N.M. 773, 606 P.2d 183 (1980)); *see also Florez v. Williams,* CIV 00-1753 JP/KBM (*Doc. 13*), *aff'd,* 41 Fed. Appx. 293 (2002); *Valdez v. Ward,* 219 F.3d 1222, 1244 (10th Cir. 2000) (not unreasonable for state court to conclude defendant who was able to remember and describe events did not warrant intoxication defense and therefore counsel not ineffective in failing to request instruction), *cert. denied,* 532 U.S. 979 (2001).  Marcos' coherent and detailed statement to the police after the incident as well as his testimony during the state habeas proceedings establishes that he would not have been entitled to the defense.  *See supra,* §§ I.B, I.D.  Counsel does not act ineffectively by failing to request an instruction not supported by the evidence.  *E.g., Lujan v. Norwood,* 62 Fed. Appx. 304, 307 (10th Cir. 2003) (citing *Le v. Mullin,* 311 F.3d 1002, 1026-27 (10th Cir. 2002), *petition for cert filed 5/9/03*).

### D.  Failure To Raise Inconsistent Verdicts Issue

When an ineffectiveness claim is based on a failure to raise an issue on appeal, the  inquiry is as follows:

> In order to succeed on his claim that appellate counsel was ineffective, [Petitioner] must first demonstrate that he would have been entitled under *Strickland* . . . to relief for the ineffectiveness of trial counsel. . . . ("When considering a claim of ineffective assistance of appellate counsel for failure to raise an issue, we look to the merits of the omitted issue."). *Strickland,* of course, requires a showing that counsel's performance was both deficient and prejudicial to the defense. . . .  The relevant question is "whether appellate counsel was 'objectively unreasonable' in failing to raise [this claim] on direct appeal and, if so, whether there is a reasonable probability that, but for his counsel's unreasonable failure to raise these claims, [petitioner] 'would have prevailed on his appeal.'"

*Duckett v. Mullin,* 306 F.3d 982, 996 (10th Cir. 2002) (citations omitted), *cert. denied*, 123 S. Ct.

1911 (2003).  "[I]t is difficult to show deficient performance [for failure to raise and issue on

appeal] because counsel 'need not (and should not) raise every nonfrivolous claim, but rather may

select from among them in order to maximize the likelihood of success on appeal.'"  *Cargle,* 317

F.3d at 1202 (quoting *Smith v. Robbins,* 528 U.S. 259, 288 (2000)).  To analyze an ineffective

claim against appellate counsel, this Court must look at the merits of the omitted issue.

> If the omitted issue is so plainly meritorious that it would have been
> unreasonable to winnow it out even from an otherwise strong appeal, its
> omission may directly establish deficient performance; if the omitted issue
> has merit but is not so compelling, the case for deficient performance is
> more complicated, requiring an assessment of the issue relative to the rest
> of the appeal, and deferential consideration must be given to any
> professional judgment involved in its omission; of course, if the issue is
> meritless, its omission will not constitute deficient performance.

*Id.* at 1203 & n.4 (and in footnote:  "This court recently rejected the idea that omission of a 'dead

bang winner' issue is a *necessary* condition for prevailing on an appellate ineffectiveness claim.

*Neill,* 278 F.3d at 1057 n. 5.  *Neill's* holding does not undermine the principle that omission of a

clearly meritorious issue can be a *sufficient* basis for such a claim.") (emphasis original).

    None of the New Mexico courts entertained this argument.  Both appellate counsel and

habeas counsel argued that the guilty verdicts for willful murder and depraved murder were

logically inconsistent because the former requires specific intent to kill whereas depraved murder

has no such intent to kill.  In other words the argument was that a conviction based on an intent

to kill cannot be reconciled with a conviction based on a recklessness act that results in an

accidental killing.  *See Doc. 14*, Exh. G at 1-3; *id., Exh. P* at 15-16.

    As a matter of federal constitutional law, I disagree that the verdicts present any

inconsistency because the State's theory on the willful murder charge was based on transferred intent.  That is, and as the jurors were instructed, Marcos intended to kill Eric but due "to a mistake or accident kill[ed] a different person [Lynnae]. . . .  In such a case the law regards the intent as transferred from the original intended victim to the actual victim."  *Record Proper* at 136.  Viewed in that context the verdicts are logically consistent.  That is, in the course of intending to kill Eric, Marcos accidentally killed Lynnae.  And the way he carried out the act of intending to kill Eric – shooting across an open field in a neighborhood while Eric was accompanied by friends -- was without regard to human life and greatly dangerous to others.

Because the verdicts are not logically inconsistent based on the facts of this case, there is no inconsistency and, accordingly, no potential due process violation.  *E.g., Laird v. Horn,* 159 F. Supp. 2d 58, 88-90 (E.D. Pa. 2001) (and cases cited therein).  As there is no merit to the claim, counsel was not ineffective.  Moreover, state law cannot provide the basis for habeas relief.  *E.g., Montez v. McKinna,* 208 F.3d 862, 865 (10th Cir. 2000).  In any event, I have found no decisions in New Mexico that hold the two verdicts are necessarily and always inconsistent as a matter of state law.  Therefore, I cannot conclude that counsel's failure to successfully raise the issue on direct appeal prejudiced Marcos in any way.

Accordingly, I find the inconsistent verdicts issues, whether raised independently, as the basis for ineffective assistance of trial or appellate counsel, or as "fundamental error," are without merit.

### E.  Cumulative Error

Habeas counsel argued that the cumulative effect of counsel's errors constituted an independent violation of *Strickland.  See Doc. 14,* Exh. P at 16-17.  Because I find no

constitutional error, as a matter of ineffective assistance of counsel or otherwise, Petitioner "also

fails to establish any cumulative error warranting habeas relief." *Neill,* 278 F.3d at 1063 (citing

*Clayton,* 199 F.3d at 1180); *see also Moore v. Reynolds,* 153 F.3d 1086, 1113 (10th Cir. 1998)

("Cumulative error analysis applies where there are two or more actual errors; it does not apply to

the cumulative effect of non-errors."), *cert. denied,* 526 U.S. 1025 (1999); *compare Darks v.*

*Mullin,* 327 F.3d 1001, 1017-19 (10th Cir. 2003) (cumulative error analysis where errors found in

death penalty case); *Cargle,* 317 F.3d at 1206 (same).

Wherefore,

**IT IS HEREBY RECOMMENDED THAT:**

1. Respondents' motion to dismiss be denied as to timeliness but granted as to the merits
   *(Doc. 15);*

2. Petitioner's access to the courts claim be dismissed as noncognizable as well as
   meritless;

3. Issues 6-11 be found procedurally-defaulted and, alternatively, without merit;

4. All remaining claims be found without merit; and

5. The § 2254 petition be dismissed with prejudice.

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

---

UNITED STATES MAGISTRATE JUDGE